465 P.2d 639

E. A. Dee BOGERT and Ruth Marion Rogers, as the successor in interest of John Rogers, Deceased, Petitioners and Respondents,

v.

Harry KINZER, Clerk of the City of Pocatello, a municipal corporation of the State of Idaho, and Don Brennan, Earl Pond, Fred Snyder, E. Norman Vaughan, William Roskelley, Rampton Barlow and Albert Minton, as the Board of Commissioners of the City of Pocatello, a municipal corporation of Idaho, Appellants.

No. 10446.

Supreme Court of Idaho.

Feb. 17, 1970.

Rehearing Denied March 24, 1970.

**516**

· Gerald W. Olson, Pocatello, for appellants.

Terrell, Green, Service & Gasser, Pocatello, for respondents.

J. N. Leggat, Boise, amicus curiae.

SHEPARD, Justice.

This case presents for our consideration the alleged unconstitutionality of provisions of our Constitution and statutes which authorize the issuance of general obligation bonds by subdivisions of government only upon the assent of two-thirds of the qualified electors voting at an election held for that purpose. The lower court held, and it is contended here, that such a requirement is violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and that the assent of a simple majority should be sufficient to authorize the issuance of such bonds. It is contended that such two-thirds majority requirement gives each negative voter greater voting power than an affirmative voter, that it, therefore, debases the vote of an affirmative voter and is offensive to the principle of "one man, one vote." We hold that the two-thirds assent requirement is not offensive to the Equal Protective Clause of the Fourteenth Amendment to the United States Constitution and reverse the judgment of the district court.

Article 8, § 3, of the Idaho Constitution provides:

"§ 3. *Limitations on county and municipal indebtedness.*—No county, city, town, township, board of education, or school district, or other subdivision of the state, shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year,. the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose, no [nor] unless, before or at the time of incurring such indebtedness, provisions shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within thirty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void: provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state and provided further that any city or village may own, purchase, construct, extend, equip, within and without the corporate· limits of such city or village, water systems and sewage collection systems, and water treatment plants and sewage treatment plants, and off .street parking facilities, public recreation facilities, and air navigation facilities, and, for the purpose of paying the cost thereof may, without regard to any limitation herein imposed, with the assent of two-thirds of the qualified electors voting at an' elec-

tion to be held for that purpose, issue revenue bonds therefor, the principal and interest of which to be paid solely from revenue derived from rates and charges for the use of, and the service rendered by, such systems, plants, and facilities as may be prescribed by law; and provided further that any port district, for the purpose of carrying into effect all or any of the powers now or hereafter granted to port districts by the laws of this state, may contract indebtedness and issue revenue bonds evidencing such indebtedness, without the necessity of the voters of the port district authorizing the same, such revenue bonds to be payable solely from all or such part of the revenues of the port district derived from any source whatsoever excepting only those revenues derived from ad valorem taxes, as the port commission thereof may determine, and such revenue bonds not to be in any manner or to any extent a general obligation of the port district issuing the same, nor a charge upon the ad valorem tax revenue of such port district."

I.C. § 50–1026 provides in pertinent part:

"If at such election, held as provided in this chapter, two thirds (⅔) of the qualified electors who pay taxes on real property within such city voting at such election, assent to the issuing of such bonds and the incurring of the indebtedness thereby created for the purpose aforesaid, such bonds shall be issued in the manner provided by the laws of the state of Idaho."

On October 29, 1968, a special election was held in the city of Pocatello to determine if general obligation bonds should be issued to finance the construction of an airport terminal and a municipal swimming pool. The airport terminal and swimming pool bond proposals received affirmative votes of 58.83 per cent and 64.07 per cent, respectively, of the total vote. The results of the election were duly certified and the proposed bond issues were pronounced defeated for lack of the necessary two-thirds assent.

Plaintiffs are qualified electors who voted at the election and stated that they voted in favor of the bond issues. They instituted this action against the officers of the city of Pocatello seeking a writ of mandate to compel a declaration and certification of the passage of the bond issue questions. The district court entered findings of fact, conclusions of law, and judgment granting the writ of mandate. The mandate was issued commanding the officers of the city to certify passage of the bond issue questions. From that judgment and issuance of the writ of mandate, the defendant city officials appeal.

■ There are preliminary questions for disposition. Amicus curiae seeks to inject a completely new and foreign issue into this appeal. He contends that the action of the lower court should be affirmed for a reason not framed by the pleadings, not argued in the lower court, and not given by the lower court as a basis for its decision. That new issue is not discussed in the briefs of the parties nor is it argued on behalf of the parties. As recited herein, the plaintiffs are qualified electors and hence property owners. They voted in the election and complain only that their votes were debased, but do not and cannot complain that they were denied their right to vote. Amicus, however, suggests the requirement that electors in such elections must be property owners is offensive to the provisions of the Fourteenth Amendment to the United States Constitution. It is sufficient to say only that such issue is not before this Court in this case and amicus curiae must take a case as he finds it without attempting to inject new issues or to tailor the case to suit his needs. State v. City of Albuquerque, 31 N.M. 576, 249 P. 242 (1926); State ex rel. Board of Railroad Com'rs v. Martin, 210 Iowa 207, 230 N.W. 540 (1930). See also

our decision of this Term, Muench, et al. v. Paine, et al., 93 Idaho 473, 463 P.2d 939 (January 16, 1970).

Appellants (defendants below) contend that the trial court had no jurisdiction to issue the writ of mandate in proceedings designed to test the constitutionality of our statutes and constitution, and particularly, where there was no clear duty to perform "an act which the law especially enjoins as a duty resulting from an office, trust or station." I.C. § 7–302. There is no clear statutory or constitutional duty demanded of any officer in this case as was required by the district court's writ of mandate. In fact, the opposite is true. It is, therefore, difficult to discern any rational basis upon which a district judge could proceed to issue a mandate which has the effect of prohibiting officers from performing duties clearly enjoined on them by law. We do not, however, decide that question and our decision herein rests on other grounds.

We are informed by all parties of the great public importance of the ultimate constitutional question involved herein. We take judicial notice of the serious problems that are presently faced by all subdivisions of government in Idaho. The questions raised in this case and *Muench* have practically destroyed the marketability of bonds issued by local units of government in Idaho. In a case of such wide and extreme public and governmental importance, questions of technicality and methodology should, if possible, be laid aside and the decision of this Court be dispositive of the ultimate issue. Rich v. Williams, 81 Idaho 311, 341 P.2d 432 (1959); Thompson v. Legislative Audit Commission, 79 N.M. 693, 448 P.2d 799 (1968); State ex rel. Sullivan v. Boos, 23 Wis.2d 98, 126 N.W.2d 579 (1964); Hudson v. Kelly, 76 Ariz. 255, 263 P.2d 362 (1953).

Plaintiffs-respondents suggest that decisions of the United States Supreme Court dealing with and interpreting the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution beginning with the case of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962), and including the late cases of Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), and Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), require the affirmance of the decision of the lower court in the case herein. Indeed, it is suggested that the era encompassed by these cases represents the logical development of judicial thinking regarding the Equal Protection Clauses as applied to the electoral process and will be characterized as "Baker to Bogert." We are required, therefore, to analyze the opinions and decisions of the United States Supreme Court in these cases.

Baker v. Carr, supra, held that a justiciable issue was presented when it was alleged that the voting rights of individuals had been debased by the malapportionment of Tennessee legislative districts to the end that one man's vote was worth less than another's only because of a difference in geographical location. We emphasize that the decision involved only the debasement of voting rights and not the fencing out or exclusion of voting rights of any individual or group. Also, the decision dealt with the significant individual rights in voting for representative government and did not extend to an individual's voting right in any other decisional process.

In 1963 the Court rendered its opinion in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), which is oftentimes referred to as the true home of "one man, one vote." It was alleged therein that individual votes had been debased because Georgia's county unit system of counting votes for statewide offices and United States Senators and Congressmen weighted the rural vote heavier than the urban vote—again the geographical problem. *Gray* involved voter equality inside Georgia as a whole and not legislative representation of voters divided into several

areas and, therefore, the case is not indicative of the issue of legislative apportionment. *Gray* does not involve representative government questions in the same context as did *Baker* and others, but in essence is still related to the issue of voting for public officials and not any other decisional process. *Gray* also is in the context of a debasement of votes and not the fencing out or exclusion of the right to vote.

In Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Court had for consideration the alleged debasement of individual voting rights by malapportionment of state congressional districts in Georgia. Although usually considered to be a "one man, one vote" decision and although argued as an Equal Protection Clause case, the decision of the Court was actually based on other grounds and many critics have suggested on bases which are historically invalid. Again we point out that the case in its broader context involves the debasement of the right of an individual to vote for his representatives in government and involves no broader context in the sense of other decisional processes. *Wesberry* involved no fencing out of any individual or class from voting.

The next significant step in the development of "one man, one vote" came in June, 1964 with the opinions of the Court in a package of reapportionment decisions oftentimes referred to as the "big six" and in which the most decisive language was contained in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Again, the Court dealt with the alleged debasement of individual votes resulting from malapportionment of the legislature of Alabama and five other states. The Court, over stringent dissent, held to the "one man, one vote" theory in all cases. All decisions involve the debasement of the right of an individual to vote for representatives in state government. Nothing in the decision requires the specific extension to other decisional making processes

and the decision was obviously limited to debasement of votes and did not include the fencing out of any individual or group from utilization of the franchise.

Carrington v. Rash, 380 U.S. 89, 85 S. Ct. 775, 13 L.Ed.2d 675 (1965), held that a state, Texas, could not exclude from exercise of the individual franchise persons serving in the armed forces. The election involved in the case was the general election of government officials in Texas. The Court held that under the Equal Protection Clause an individual who was a bona fide resident could not be denied his right to vote merely because he was in the military service. The Court affirmed the right of states to impose reasonable requirements for exercising the franchise, but held that the imposition of that particular state standard was a denial of equal protection. In that case the Court again was speaking in terms of the ability to exercise the franchise for the selection of representative government and the fencing out from the privilege and was not speaking of the debasement of the vote.

In 1966 the Court decided the case of Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed. 2d 169 (1966), in which the constitutionality of the Virginia poll tax was placed in issue as violative of the Equal Protection Clause. The Court held that such was indeed a violation of the Equal Protection Clause, stating:

"* * * once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."

Again, the Court held that what was involved was the fencing out from the franchise, not the debasement of the vote of the individual. Also involved therein were elections for government officials and no broader decisional process was involved. Although the decision was rendered on the basis of the Equal Protection Clause, it is obvious that the Court, in keeping with its previous decisions regarding primarily

race problems, had determined in its mind that the imposition of a fee for the privilege of voting was evil and "invidious." There was no allegation or proof in *Harper* that the poll tax had been applied in a discriminatory sense to the individual plaintiffs and, therefore, there was no real deviation from "equal protection of the laws." Since all persons in the state were treated equally in their requirement to pay a poll tax for the privilege of voting, it can hardly be said that there was "invidious discrimination" against the plaintiff. Rather obviously, the Court decided that in the area of elective process for representative government no payment of any fee should be required. The decision must rest on the basis that the exercise of the franchise to select one's representatives in government is to be encouraged and anything that tends to limit it should be discouraged. The case stands upon the foundation of fencing out or excluding from the franchise and is not a debasement case. Also, it involves elections for the purpose of selecting representative government and is not extended to other decisional processes. The case is oftentimes cited for the proposition that wealth cannot be utilized as a standard for granting or denying voting rights to an individual.

In Sailors v. Board of Education, etc., 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967), the Court refused to extend the Equal Protection Clause to an alleged exclusion of voters from selecting non-legislative local officials by appointment rather than by election. The Michigan statute in question provided that county school boards be chosen by delegates from local school boards rather than by direct election. The issue presented there was obviously a fencing out or exclusion of persons from exercising the franchise, although all persons rather than particular individuals or groups were thus "fenced out." Although the decision is in terms of representative officials, they are representative officials selected by appointment rather than by vote and to that extent is

not reflective of the right of individual voters to participate in other decisional making processes.

In Avery v. Midland County, Texas, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), it was alleged that individual voting rights were debased through the malapportionment or maldistricting of county precincts in elections for local officials. The Court applied the "one man, one vote" principle enunciated in Reynolds v. Sims, supra, to local units of government. The problem was debasement, not the fencing out from the franchise of any persons or groups. *Avery* involved the selection of representative government, not an election for any other decisional making process.

This brings us to the latest cases which are relied upon heavily by plaintiffs-respondents in the instant action. In 1969 the Supreme Court announced its decisions in Kramer v. Union Free School Dist. No. 15, supra, and Cipriano v. City of Houma, supra. In both *Kramer* and *Cipriano* it was alleged that certain persons or groups had been fenced out of and excluded from the franchise. In *Kramer* the New York statute restricted the franchise in choosing local school board officials to those who either owned real property or had children who were in school attendance in the district. In *Cipriano* a Louisiana statute prohibited voting in revenue bond elections by anyone except real property owners or their spouses.

Although the Court in *Kramer* in its terse per curiam opinion indicated otherwise, that decision appears to stand for the non-exclusion of individuals in what was, in effect, a representative government election. The decision hints that perhaps other decisional processes were involved, such as the imposition of taxes, but such is not clear from the opinion. *Cipriano,* on the other hand, deals with a decision making process other than the election of representative government. It is not involved with vote debasement, but rather involves the fencing out or exclusion of certain per-

sons or groups of persons from an exercise of the franchise.

What, then, may we view as logical and coherent threads running through the above decisions? Votes cast in the process of selecting representatives in government may not be debased to the end that one person's vote is worth more than another's because of geographic location. Persons may not be denied the right to vote for their representatives in government because of distinctions which are "invidious." Evidently, the determination of "invidiousness" will be made on a case by case basis, but includes at least factors of race, wealth, property ownership and military service.

Persons may not be denied the voting right in other decision making elections when such denial results in a fencing out without a rational basis. There must be a reasonable relationship between the interest or non-interest of a group and its being granted or denied the vote. These decisions again are evidently made on a case by case basis. Race is not a reasonable relationship upon which to base a denial; ownership of property or parenthood are not sufficient criteria of interests in school board elections having overtones of other decision making; ownership of property is not a sufficient criteria of interest in a revenue bond election when non-property owners will utilize and pay for the services, but property ownership is a sufficient criteria in an election to determine the issuance of general obligation bonds.

Impliedly and paradoxically, however, persons under 21 and non-residents may be denied the vote even though they may be emancipated, be parents, own property, be better informed than many who are granted the franchise, and use and pay for the services to be derived from the proceeds of a bond sale.

We believe and hold that nowhere in the lines of cases is there even a hint that the constitutional and statutory provisions in the case at bar, which allegedly "debase" the vote of plaintiffs-respondents, are offensive to the requirements of the Equal Protection Clause. We emphasize that in the case at bar there is no allegation or argument concerning fencing out or exclusion from the voting franchise. The election was not held for the purpose of selecting representatives in government.

Plaintiffs-respondents draw our attention to additional cases in which the question presented herein was also discussed by the Courts of West Virginia and New Mexico. The West Virginia Court in the case of Lance v. Board of Education, 170 S.E.2d 783 (1969), had for consideration that state's constitutional requirement of a three-fifths vote for the passage of bonded indebtedness by local tax levying bodies. Plaintiffs contended that the requirement conflicted with the Equal Protection Clause of the United States Constitution as interpreted by the cases enunciating the "one man, one vote" theory. That Court reviewed the decisions of the United States Supreme Court beginning with Baker v. Carr, supra, and including *Kramer* and *Cipriano*. Substantial reliance was placed on the case of State ex rel. Witt v. State Canvassing Board, 78 N.M. 682, 437 P.2d 143 (1968). The Court held that the provisions of the West Virginia Constitution were in conflict with the Equal Protection Clause and struck down the three-fifths vote requirement. The essence of that Court's decision is stated:

"We are unwilling to concede that a determination of issues such as those involved in this case cannot be safely entrusted to a majority of the voters."

This Court, in contrast, is unwilling to concede that a determination between competing political theories and which would require the application of the doctrine of sheer majoritarianism can be safely entrusted to the judicial branch of government of Idaho when our people and our legislature have spoken otherwise. We are unwilling to concede that the specific words of the Equal Protection Clause require the decision reached by the West Virginia Court, and we do not

concede that the language of the decisions of the United States Supreme Court, to this date at least, requires the decision of the West Virginia Court. We do not adopt, but specifically reject, the language and the reasoning of the West Virginia Court.

That Court further said:

"It is asserted by counsel for the defendants that the Constitution of the United States contains many provisions which are repugnant to the idea of majority rule, including a provision that ratification of treaties requires a concurrence of two-thirds of the Senators present and voting, requirements pertaining to amendment of the Constitution, and provisions relating to overriding a veto of a bill by the president. We consider this contention frivolous and wholly beside the point."

Later discussion herein will indicate that this Court does not consider those points raised as frivolous and wholly beside the point, but rather of substantial significance in determining whether or not this nation is to be considered as completely committed to a majoritarian form of government in all its aspects, with all of the changes in fundamental concepts of federal, state and local government that such a theory implies and requires.

As stated, the Court in Lance v. Board of Education, supra, placed substantial reliance on the New Mexico case of State ex rel. Witt v. State Canvassing Board, supra. Plaintiffs-respondents herein also rely heavily on *Witt*. We suggest that the opinion of the New Mexico Court does not stand analysis when cited as authority for the decision of the West Virginia Court or the decision of the lower court herein. In fact, we can only gather from the opinion in *Witt* that if the New Mexico Court was squarely faced with the constitutional and statutory provisions of West Virginia and Idaho, it would find them to be constitutional and not violative of the Equal Protection Clause.

The New Mexico Court in *Witt* was dealing with constitutional provisions which made amendment of that constitution not only burdensome and onerous, but nearly impossible. Those constitutional provisions required that a proposed constitutional amendment be approved by a vote of two-thirds of those voting in each of the many counties in the state. Secondly, a proposed amendment was required for approval to receive at least a three-fourths majority of all of the votes cast in the whole state. The principal thrust of the *Witt* decision related to the two-thirds majority vote required in each of the many counties. Reasoning primarily from the decisions represented by the Reynolds v. Sims, supra, opinion, the New Mexico Court held that the two-thirds majority requirement in each county violated the Equal Protection Clause. The Court said at page 688, 437 P.2d at page 149:

"We can see no escape from the conclusion that a requirement of a two-thirds favorable vote in every county, when there is a wide disparity in population among counties, must result in greatly disproportionate values to votes in different counties. Where, as here, a vote in Harding County outweighs the 100 vote in Bernalillo County, the 'one person, one vote' concept announced in Gray v. Sanders, supra, certainly is not met."

Also specifically raised was the question as to whether or not the proposed constitutional amendment had obtained the necessary three-fourths majority of all the votes in the state. The New Mexico Court, in passing on that portion of the constitutional requirement, did not discuss the arguments proposed by plaintiffs-respondents here, viz., that a requirement of more than a majority vote debased the vote of a person who desired to vote in favor of a proposition as compared with the value of the vote of a negative voter. The Court, without question or discussion, impliedly upheld the requirement that a proposed constitutional

amendment receive a three-fourths majority. The New Mexico Constitution continues to contain a requirement that proposed constitutional amendments obtain the assent of three-fourths of the voters and presumably no proposed constitutional amendment becomes effective absent such a vote.

Hence, although we may disagree with the assertion of the New Mexico Court that there is or should be no difference in the application of debasement of vote theories between governmental representation cases and constitutional amendment cases, we remain of the opinion that the *Witt* case does not stand for the proposition asserted for it by the West Virginia Court and plaintiffs-respondents herein.

We arrive then at the ultimate issue in this case, which, is do the philosophical bases underlying decisions such as Reynolds v. Sims, supra, or what Robert Dixon [1] has called the outreach and impact of "one man, one vote," require the affirmance of the lower court decision herein? Our answer is no. It has been said that the first step in the search for truth is to call things by their right names. So it is with the case at bar. What is urged upon us here has nothing to do with social justice, morality or inequality. It presents a question of governmental theory.

The definition of democracy and its application in any scheme of government has been argued round and about since the time of the Greek City-States. It was discussed before, during and after the formation of our present structure of federal government. DeTocqueville and others have commented on majoritarianism, the modifications of it in American government and the dangers to America which could result from a tyranny of the majority. Modifications of the doctrines of pure majoritarianism during the Federal Constitution-

al Convention may have been, as some claim, sheer political expedience. Nevertheless, those modifications were adopted as portions of the Constitution of the United States and they remain as portions of that document today. In the minds of many scholars they have worked well in restraining impulses of the moment and bringing about moderation. As stated by Robert Dahl:

> "Probably this strange hybrid, the normal American political system is not for export to others. But so long as the social prerequisites of democracy are substantially intact in this country it appears to be a relatively efficient system for reenforcing agreement, encouraging moderation and maintaining social peace in a restless and immoderate people operating a gigantic, powerful, diversified and incredibly complex society." [2]

The Equal Protection Clause has been described by Freund [3] as a moral standard wrapped in a legal command which allows the Court in establishing constitutional doctrine to help shape the nation's thinking about social justice and ethical conduct. Assuming that there has been a problem in this nation in the protection of the rights of persons accused of crime, it may be all very well for the United States Supreme Court, using as a vehicle the Equal Protection Clause, in individual state criminal cases to attempt to change the face of law enforcement across this country. Assuming that as a result of state legislative malapportionment across this country urban voters were being denied their right to representative government, it may have been all very well for the United States Supreme Court to change the face and makeup of state legislatures in the name of the Equal Protection Clause and individual rights. Assuming that racial and other minority groups were denied equality in the exercise

1. Robert G. Dixon, Jr., Democratic Representation—Reapportionment in Law and Politics (1968).

2. Robert A. Dahl, A Preface to Democratic Theory (1956).

3. Paul A. Freund, On law and justice (1968).

of their voting, educational and other rights, it may have been all very well for the Court to attempt to change the face of this nation and remove from it the cancer of prejudice with the Equal Protection Clause as a scalpel.

However, it is a far different thing for this Court or any court to insert its judgment into the area of pure political theory. We do not believe that the theory of "one man, one vote," as discovered in the Equal Protection Clause, militates against and prohibits the continuation of a political theory which lies at the foundation of our government, which, simply stated, is, a consensus amounting to more than a simple majority is not only desirable but necessary at certain times and in certain circumstances. One viewpoint of that matter is stated as follows:

"Is a simple and invariable majoritarianism what we mean by democracy? Since when? The Supreme Court, which has a great deal to do with how we are governed, is not only not majoritarian, it is not even elected. The Senate also wields a good bit of power over us, (and in the judgment of many it has in recent years been more responsive to the public interest than has the House); in the Senate, each state, regardless of population, has an equal vote, of which no state may be deprived, says the Constitution, even by a duly passed and ratified amendment, without its own consent. In the House, although each state has at least one vote, the whole state may be—and some are—considerably smaller in population than the average Congressional district.

"Aside from the fact that very few of our institutions, and none of our national ones, are out-and-out majoritarian, we don't choose to do everything by simple majority votes. It takes a two-thirds vote in the Senate to ratify a treaty, and a two-thirds vote in the Senate and House to propose a constitutional amendment, which must then be ratified by the legislatures of three-fourths of the states. A Congress in which the entire House

and one-third of the Senate are newly-elected, and which is thus the authentic voice of a popular majority, if ever there is one in our national institutions, may pass a law, but a President elected two years earlier and now perhaps out of tune with the new majority may veto the law. If he does, it takes a two-thirds vote in the Senate and House to override his veto and make a valid law.

"One may view all these institutions and devices as outrageously undemocratic, hardly less undemocratic than the electoral college, and be prepared to sweep one or all of them away also, including the Supreme Court, the next time the majoritarian broom cleans out the stables. In truth these institutions and devices tell us that throughout our history we have perceived other values in government than its reflection of simple majorities of the moment, which are in any event not easy to find or may be whipped up on demand. We have lived this democracy as a rather complex sum of these values, not just as uncompromising majoritarianism. We have, since Madison, understood that people tend to act politically not so much as individuals as in groups; that they have opinions, preferences and interests which vary in intensity, thus calling for varying degrees of respect and forebearance on the part of others, even if those others constitute a majority; that majorities sometimes act rashly and even mindlessly, and may need to be given pause; that, in short, influence and even power should be distributed more widely than they would be in rigid adherence to the majoritarian principle, so that government may rest on widespread consent rather than teetering on the knife-edge of a transient 51 percent. For we have wanted government to be stable and peaceable, and to have the most limited need to resort to coercion. What we have evolved, therefore, is a pluralist system, in Professor Robert Dahl's phrase, of minorities rule. We have striven, perhaps it may be said, not for a

majoritarian, but for a participatory democracy, in which access to the process of government is continuously available to all groups." [4]

We are searching to ascertain the letter and the spirit of the United States Constitution. As stated as far back in our legal history as M'Culloch v. State of Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819):

"Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

Thus, we believe the casual brushing aside of elements in these Federal Constitution modifying strict majoritarian theories, as was done by the West Virginia Court, is to ignore important aspects of the question. The Constitution in certain portions thereof, specifically requires the approval of more than a simple majority vote in deciding certain questions. It is, we believe, the height of illogic to suppose that a portion of that same document as tenuous and abstract as the Equal Protection Clause prohibits a state from the utilization of a political tool which it specifically authorizes and requires in other circumstances. We realize and accept that such reasoning is not borne out by the decision of the United States Supreme Court in Reynolds v. Sims, supra, dealing with one House of a state legislature as compared with the United States Senate. However, that doctrinaire approach has not as yet been applied to situations clearly reflecting the question of majoritarianism.

In the ultimate, all of it was perhaps best said by Mr. Justice Harlan in his opinion in Harper v. Virginia State Board of Elections, supra, 383 U.S. at page 686, 86 S.Ct. at page 1092:

"It is of course entirely fitting that legislatures should modify the law to reflect such changes in popular attitudes. However, it is all wrong, in my view, for the Court to adopt the political doctrines popularly accepted at a particular moment of our history and to declare all others to be irrational and invidious, barring them from the range of choice by reasonably minded people acting through the political process. It was not too long ago that Mr. Justice Holmes felt impelled to remind the Court that the Due Process Clause of the Fourteenth Amendment does not enact the laissez-faire theory of society, Lochner v. New York, 198 U.S. 45, 75–76, 25 S.Ct. 539, 546, 49 L.Ed. 937. The times have changed, and perhaps it is appropriate to observe that neither does the Equal Protection Clause of that Amendment rigidly impose upon America an ideology of unrestrained egalitarianism."

Judgment of the district court is reversed and the case is remanded to the district court with instructions to dissolve the writ of mandate and dismiss the action. Costs to appellants.

McFADDEN, C. J., and McQUADE, J., and HAGAN, District Judge, concur.

DONALDSON, Justice (dissenting).

I dissent. It is my opinion that the "one man, one vote" principle of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution should be applied to a case of this nature where there is an alleged debasement of the vote in a municipal election on a general obligation bond which requires a ⅔ majority vote for passage. The United States Supreme Court recently held that the Equal Protection Clause applies to municipal elections on revenue bonds. Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969). It is true that *Cipriano* involved the denial of the franchise to a non-property owner rather than the alleged debasement or dilution of a vote. However this is a distinction without a

4. New Republic (September, 1969).

difference since it is settled law that the dilution of the vote is also violative of the Equal Protection Clause of the Fourteenth Amendment. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Avery v. Midland County, Texas, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). As the Supreme Court said in *Reynolds* at page 555 of 377 U.S., at page 1378 of 84 S.Ct.

" * * * the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."

It is therefore apparent that the Equal Protection Clause of the Fourteenth Amendment is applicable to the alleged dilution of the vote in a municipal election concerning general obligation bonds. See also, Lance v. Board of Education, W.Va., 170 S.E.2d 783 (1969).

Since the Fourteenth Amendment is applicable the alleged Equal Protection Clause infringement must be judged by traditional standards of equal protection; i. e., it must be determined whether or not the ⅔ majority voting requirement creates a class against which there is discrimination, and if it does, whether there is a compelling state interest to justify it. Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). In regard to the first question it is not disputed that by requiring a ⅔ majority of favorable votes to pass a bond issue that negative voters have twice as much voting power in the bond election as do the affirmative voters. Apart from this discrepancy there is no difference in the qualifications of the voters. Therefore there is discrimination. However it is not directed at sex, residence, color, economic status, or geographic location, but it is directed at a class of persons who happen to hold a particular point of view and results in a functional discrimination. That a point of view may not be discriminated against is clear from Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965),

" * * * 'fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." 380 U.S. 89, 94, 85 S.Ct. 775, 779.

It is a sophisticated rather than simple-minded discrimination since the debasement or dilution only occurs when the voter decides upon which place on the ballot to place his "X." The United States Supreme Court said in Reynolds v. Sims, *supra*, "One must be ever aware that the Constitution forbids 'sophisticated as well as simple-minded modes of discrimination.' "

However discrimination by a state law is not per se a violation of the Equal Protection Clause if it is based on a compelling state interest. Kramer v. Union Free School District No. 15, *supra*; Cipriano v. City of Houma, *supra*. The articulated state interest in requiring a ⅔ majority vote in bond elections is a prudent fiscal policy which requires that there be a substantial approval of a given project before a municipality embarks on a voyage of increased indebtedness. This state policy of fiscal restraint would have more weight if it was not already safeguarded by the constitutional requirement that voters at bond elections must be property owners. In the recent case of Muench, et al. v. Paine, et al., 93 Idaho 473, 463 P.2d 939 (January 16, 1970) this Court upheld this constitutional provision. This Court held that property owners as taxpayers, by and large have a greater and more permanent economic stake in the community than non-property owners. Further, I.C. § 50–1019 limits the amount of bonds that can be authorized to 10% of the assessed full cash valuation of the property within the city. Therefore the voters who will be required to pay the taxes are the ones who decide whether or not a bond issue shall be approved. The Supreme Court of West Virginia in the case of Lance v. Board of Education, *supra*, held that the ⅗ vote re-

quirement of the West Virginia Constitution relating to elections on bond issues was in conflict of the Equal Protection Clause of the Constitution of the United States and was therefore unconstitutional and unenforceable. Thus it is my opinion that this state interest is not sufficiently compelling to warrant protection in light of modern conditions which refute the bases for this policy. As written in the Public Affairs Report of the Institute of Governmental Studies, University of California, Berkeley, Vol. 10, No. 4, August, 1969.

"Regardless of whether the [⅔] requirement could be considered appropriate for the conditions prevailing in the late 1800's, it is obvious that virtually every factor that may then have been relevant has since changed drastically. For example, great improvements have been made in the quality and integrity both of the legislative processes and of financial administration. Local legislative bodies of the present are far more responsible than their counterparts were a century ago. A corps of highly trained professional administrators, finance officers, and financial/bond consultants is available to serve even the smallest jurisdictions.

Numerous modern procedures of fiscal administration have been developed since 1879. A host of auditing and financial accounting requirements have been written into law. The bond market itself is subject to safeguards precluding most of the practices that the 1879 constitutional provision was probably intended to correct. For example, greatly improved reporting procedures are now in effect, assuring that full and accurate information on the financial and legal ramifications of individual bond issues is supplied to prospective buyers. Highly qualified bond consulting firms, specialized legal counsel, and careful bond issue evaluation by respected national rating agencies, have all built strong public confidence in most local bond offerings. The sense of security appears to be general, and is not limited to states requiring an extraordinary majority vote. This fact, in itself, strongly suggests that the many institutional and procedural improvements outlined here—and not the two-thirds requirement—are responsible for the soundness of modern local capital outlay finance."

Unquestionably, taxes are a vitally important political necessity and must be given equality of determination by the qualified electorate the same as elected officials or constitutional amendments, that is, by one person, one vote, not one person, two votes. As the United States Supreme Court said:

"The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. * * Once a class of voters is chosen and their qualifications specified, [there is] no way by which equality of voting power may be evaded. The conception of political equality from the Declaration of Independence to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." Gray v. Sanders, *supra.*

I therefore find that Article VIII, Section 3 of the Idaho Constitution and I.C. § 50–1026 violate the "one man, one vote" principle of the Equal Protection Clause of the Fourteenth Amendment by treating unequally in voting power voters who are otherwise equal, and that the state interest in a prudent fiscal policy is not sufficiently compelling to justify this discrimination since it is already adequately safeguarded.