659 P.2d 1294

In the Matter of a CONTEST OF A CERTAIN SPECIAL ELECTION; Special Road Districts Nos. 9, 10, 11 and 12, Joint Powers Authority (Fountain Hills) of Maricopa County, Arizona, Consolidated Election Precinct, May 5, 1981:

Jesse Sol GENIN, Bella Genin, Edward Joseph Connor, Jean Frances Connor, Clifford Stephen Kozlow and Kasimir Moran Tritschler, Petitioners Appellees,

v.

SPECIAL ROAD DISTRICTS NOS. 9, 10, 11 AND 12, Joint Powers Authority (Fountain Hills) of Maricopa County Arizona, Respondents Appellants

and

MCO Properties, Inc. and Johanna K. Kobli, Intervenors Appellants.

No. 1 CA–CIV 6254.

Court of Appeals of Arizona, Division 1, Department B.

Nov. 2, 1982.

Rehearing Denied Dec. 29, 1982.

Review Denied Feb. 23, 1983.

Langerman, Begam, Lewis & Marks, P.A. by Frank Lewis, Phoenix, for petitioners appellees.

Ryley, Carlock & Ralston, P.A. by Joseph P. Ralston, Phoenix, for respondents appellants.

Martori, Meyer, Hendricks & Victor, P.A. by Larry A. Hammond, Randall C. Nelson, Phoenix, for intervenors appellants.

OPINION

RICHARD M. DAVIS, Judge Pro Tem.

The appellants challenge a two-thirds affirmative vote requirement in the statute authorizing the issuance of special road district bonds. The trial court rejected the challenge, and we affirm its decision.

The appellant special road districts were organized in 1973 pursuant to A.R.S. §§ 18–251 et seq. The districts are located in the Fountain Hills area of Maricopa County. The four districts have consolidated and operate through a joint board of trustees. In 1974 they sought and received from the voters within their districts the right to issue $24,000,000 in bonds at a maximum interest rate of 9 percent. Approximately $6,000,000 of the bonds were sold in 1974.

Because the subsequent general rise in interest rates prevented the successful marketing of the remaining bonds, the trustees decided in 1979 to ask the district electorate to authorize an increase in the maximum

interest rate to 12 percent.[1] Issuance of special road district bonds may only be authorized upon the affirmative vote of two-thirds of those voting. A.R.S. § 18–259(B). An election was held, and 52.9 percent of those lawfully voting approved the proposed increase in the interest rate. The districts nevertheless certified the results of the election to the Board of Supervisors as if there had been approval by two-thirds of those voting, and they have maintained that the issue carried.

Appellees are voters in the districts who opposed the proposal to increase the maximum interest rate. They brought an election contest in the Superior Court pursuant to A.R.S. § 16–1201. The appellants MCO Properties, Inc., developer of Fountain Hills, and Johanna Kobli, a proponent of the proposal, were allowed to intervene. The appellants contended below as they do here that the two-thirds "super-majority" voting requirement violates the Equal Protection Clause of the 14th Amendment to the United States Constitution because special road districts are the only bonding districts in the state for which a two-thirds affirmative vote is required. Based upon the assumed correctness of that position, appellants further contend that A.R.S. § 18–259(B) can and should be construed as authorizing approval of an increase in the interest rate by a simple majority vote. Appellants thus take the position that the issue passed. The parties stipulated to the material facts in the trial court, and based thereon the trial court rendered summary judgment in favor of appellees, holding that the issue did not pass.

By way of brief historical background, it appears that the development of the Erie Canal ushered in an expansive period of state and municipal financing. There were excesses, and concern over the large indebtedness of local governments was heightened by the Panic of 1873. In the more cautious atmosphere that followed, many states enacted requirements that bonds be approved by more than a simple majority. In 1970, the constitutions of 20 states required referendum approval by special majorities ranging from 55 percent to 75 percent. See generally, Note, "Judicial Activism and Municipal Bonds: Killing Two-Thirds With One Stone?", 56 *Va.Law Review* 295 (1970).

Citing the federal Constitution's own super-majority requirements, the United States Supreme Court rejected a challenge to a 60 percent affirmative vote requirement in a school bond election. *Gordon v. Lance*, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971). It also affirmed *per curiam* a three-judge federal district court decision rejecting a challenge to a two-thirds affirmative vote requirement in another school bond case. *Brenner v. School District of Kansas City, Missouri*, 403 U.S. 913, 91 S.Ct. 2225, 29 L.Ed.2d 692 (1971), *affirming* 315 F.Supp. 627 (W.D.Mo.1970). Challenges to extraordinary majority voting requirements have been rejected in other courts. *Amador Valley Joint Union High School District v. State Board of Equalization*, 22 Cal.3d 208, 149 Cal.Rptr. 239, 583 P.2d 1281 (1978); *Lefkovits v. State Board of Elections*, 400 F.Supp. 1005 (N.D.Ill., 1975); *Tiews v. Timberlane Regional School District*, 111 N.H. 14, 273 A.2d 680 (N.H.1971); *Adams v. Fort Madison Community School District*, 182 N.W.2d 132 (Iowa 1970); *Bogert v. Kinzer*, 93 Idaho 515, 465 P.2d 639 (1970).

The appellants nevertheless argue here that appellees must and cannot show a "compelling state interest" to justify the two-thirds requirement, or, in the alternative, that they cannot show a rational basis for the legislation. These arguments are advanced in connection with appellants' basic position that they are denied the equal protection of the laws because voters in cities and towns[2] and in general improvement districts[3] may obtain passage of road construction or improvement programs by a simple majority vote.

---

1. While there is no statute expressly authorizing an election on the rate of interest, alone, that is not an issue on this appeal.

2. *See* A.R.S. § 9–781 *et seq.*

3. *See* A.R.S. § 11–771 *et seq.*

The cases which appellants rely upon to support their argument that appellees must demonstrate a "compelling state interest" for the provision in question are cases where some group of citizens have been excluded from participating in an election. *See Hill v. Stone,* 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975), *City of Phoenix v. Kolodziejski,* 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970), *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), and *Police Jury of the Parish of Vermilion v. Herbert,* 404 U.S. 807, 92 S.Ct. 52, 30 L.Ed.2d 39 (1971), *reversing per curiam,* 258 La. 41, 245 So.2d 349 (1971), each involving the ownership or "rendering" of property as a prerequisite to the right to vote; and *see also Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Harper v. Virginia State Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); and *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)[4] The United States Supreme Court has developed in these cases a standard of "strict judicial scrutiny" which places the burden of justification on the proponent of legislation which creates a suspect classification or impacts adversely upon some basic constitutional right. *See San Antonio Independent School District v. Rodriquez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Arizona Downs v. Arizona Horsemen's Foundation,* 130 Ariz. 550, 637 P.2d 1053 (1981). This *Hill v. Stone* line of cases is plainly inapposite to the present case, however, because it is without dispute that every otherwise qualified elector in the districts is entitled to vote in a bond election.

The crux of the holding in *Gordon v. Lance* is that so long as a more-than-majority vote requirement in a bond case does not "discriminate against or authorize discrimination against any identifiable class ... [it does] not violate the Equal Protection Clause." 403 U.S. at 6, 91 S.Ct. 1891. *Gordon v. Lance* must itself be taken as standing for the proposition that, unless they are in some manner otherwise identified, the proponents of a bond issue are not themselves such an "identifiable class", or a "discrete and insular minority."

Appellants argue, however, that this case is distinguishable from *Gordon v. Lance* and that this case presents the situation reserved in *Gordon v. Lance* for future decision. Appellants refer to the following passages at 403 U.S. at 5, 91 S.Ct. at 1891:

> Unlike the restrictions in our previous cases, The West Virginia Constitution singles out no "discrete and insular minority" for special treatment. The three-fifths requirement applies equally to all bond issues for any purpose, whether for schools, sewers, or highways. We are not, therefore, presented with a case like *Hunter v. Erickson,* 393 U.S. 385 [89 S.Ct. 557, 21 L.Ed.2d 616] (1969), in which fair housing legislation alone was subject to an automatic referendum requirement.
>
> The class singled out in *Hunter* was clear—"those who would benefit from laws barring racial, religious, or ancestral discriminations," supra, at 391 [89 S.Ct. at 560, 21 L.Ed.2d at 662]. In contrast, we can discern no independently identifiable group or category that favors bonded indebtedness over other forms of financing. Consequently no sector of the population may be said to be "fenced out" from the franchise because of the way they will

---

**4.** Tangential to these cases, and lending perspective to them, are the "one person, one vote" cases which followed *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), including *Grey v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), and *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *See Hadley v. Junior College District of Kansas City, Missouri,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) and cases cited therein. Appellant here has not argued from

this line of authority. *Cf. Gordon v. Lance, supra.*

The parties have also cited and discussed the special purpose district cases, *Ball v. James,* 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981), and *Salyer Land Co. v. Tulare Lake Basin Water Storage District,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973), which involved the right to vote and the weight to be accorded votes. These have no specific application here.

vote. Cf. *Carrington v. Rash,* supra, at 94 [85 S.Ct. at 779, 13 L.Ed.2d at 679].

We are not persuaded, upon a reading of *Gordon v. Lance* in its entirety, that uniformity of an affirmative vote requirement within a state is essential to the force of the general principles set forth. A lack of uniformity would, of course, be a critical factor if a design to discriminate was otherwise apparent.

Appellants have cited in their briefs 21 bond-authorizing provisions in the Arizona Revised Statutes applicable to a variety of issuers, including hospitals, utilities, municipalities and various districts. Appellants assert without rebuttal from appellees that special road districts are the only Arizona issuers for which more than a simple majority vote is required. In arguing that special road districts are unreasonably distinct in regard to the issuance of bonds, appellants focus upon a comparison with general improvement districts (A.R.S. § 11–771 *et seq.*) and cities, towns, counties and entities authorized to issue bonds pursuant to A.R.S. §§ 9–782, 18–236 and 35–452.

The special road district legislation, including provisions in respect to bonds, predates statehood. *See Bartlett v. MacDonald,* 17 Ariz. 194, 149 P. 752 (1915). A special road district can be no more than one mile wide and ten miles long. It is created upon presentation of a petition by 25 taxpayers to the board of supervisors and a subsequent two-thirds affirmative vote of the district electorate. When the trustees propose to sell bonds, nothing more than the amount, denominations, maximum rate of interest and terms of the bonds need be stated in the notice. A.R.S. §§ 18–251, 18–253 and 18–258.

By contrast, the creation of a general improvement district requires certain affirmative findings by the board of supervisors as to public benefit and when bond authorization is sought, a declaration of necessity for improvements and statement of purpose is required. A.R.S. §§ 11–771.02, 11–771.05 and 11–771.22. An incorporated city or town issuing bonds pursuant to A.R.S. § 9–781 *et seq.* must state the purpose for which bonds are to be issued. Cities and towns are also required to be compact, i.e., "urban in nature." A.R.S. § 9–101(E). The county highway bond issuing procedure involves the appointment of a county highway commission and the preparation of a report and maps indicating the proposed improvements and construction, and these must accompany the call for election. A.R.S. §§ 18–231, 18–232, 18–233 and 18–236. When bonds are sought to be issued pursuant to A.R.S. §§ 35–451, *et seq.,* a statement of purposes is required. A.R.S. § 35–455.

Thus, apart from the fact that a special road district might well be formed in a rural area, with relatively few property owners to foot the bill, the special road district bond provisions are unique in the lack of information required to be furnished to the voters prior to election.

■ Nothing of which we are aware requires the state to provide for the creation of special road districts or to grant them bonding power. The bonding power with its potential lien on the property of nonapproving landowners is in sharp derogation of the common law. An election authorizing a bond issue binds not only present, but also future taxpayers. *Gordon v. Lance, supra.* And as at least one court has observed, bond referenda are apt to attract few voters. *Brenner v. School District of Kansas City, Missouri, supra.* Notwithstanding the rationale of Lord Mansfield to the effect that those who do not vote forfeit the right to complain, *Rex v. Foxcroft,* 2 Burr. 1017 (1760), a state has an interest in providing for a broader consensus for substantial public indebtedness than a bare majority of what perhaps might be a small minority. *Brenner v. School District of Kansas City, Missouri, supra.*

It should also be noted that when appellants seek to demonstrate that a general improvement district can be used for the same purposes as a special road district, they demonstrate too much. Assuming without determining the accuracy of appellants' proposition, a case of discrimination can hardly be made out of the fact that the state has, in effect, offered its interested

citizens optional routes to a desired end, one of which does not involve the asserted discriminatory condition.[5]

Appellants have invited us to closely compare the special road district legislation with other enactments and we have accepted the invitation to do so. We should not be understood as holding or implying, however, that every surface distinction in arguably analogous legislation demands such rigorous analysis. Legislating is not a perfect science and even with the best data processing equipment probably never will be.

While we would not endorse everything in the majority's decision in *Bogert v. Kinzer, supra,* we endorse the idea advanced by Judge Shepherd that an attack on a high-margin vote requirement is essentially an attack on a procedure or method of government—a method which places a high premium on stability and consensus. The Equal Protection Clause, on the other hand, is vitally aimed at invidious discrimination against people, and groups of people. *See, e.g., Morey v. Doud,* 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). There is no hint of invidious discrimination here. To the extent that the idea of classification is relevant at all to this kind of weighted voting, the voter classifies himself, and only after he votes. A myriad of factors may have gone into his decision to vote yea or nay.

Every duly enacted statute is entitled to a presumption of constitutionality. *Town of Lockport v. Citizens for Community Action,* 430 U.S. 259, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977). While we have some doubt that the subject statute has been effectively called into question so as to require a showing of rational basis, *see Brenner v. School District of Kansas City, Missouri, supra,* to the extent it has it very clearly passes muster.

Judgment affirmed.

GRANT, J., concurs.

**5.** The legislation authorizing creation of general improvement districts appears to have been created for developing new communities. *See* Comment, "Arizona General Improvement Districts Statute: A Vehicle For Planned Community Development," 1972 Law and the Social Order 264.

NOTE: The Honorable Richard M. Davis, a Judge *pro tempore* of a court of record, has been authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court pursuant to Arizona Const. art. VI, § 20.

JACOBSON, Presiding Judge, concurring.

The result in the majority opinion is correct. What requires me to write a concurring opinion, is the tacit failure of the majority opinion to fully come to grips with whether or not individuals residing in special road districts created pursuant to A.R.S. § 18–251 et seq. constitute a class for the purposes of invoking the equal protection clauses of both the Arizona and United States constitutions. In my opinion, these individuals constitute such a class.

As the majority opinion points out, of the numerous bonding provisions applicable to a myriad of governmental units, only residents of special road districts are singled out for super majority voting requirements. This is in sharp contrast to the statutory scheme under consideration in *Gordon v. Lance,* 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971), the principal authority relied on in the majority opinion. In *Gordon,* at issue was the constitutionality of a scheme in West Virginia which required that *all* political subdivisions of the state could not incur bonded indebtedness without the approval of 60% of the voters. Essential to a resolution of this issue was whether or not a denial of simple majority approval was a denial of equal protection. The court held it was not. I therefore agree with the majority's conclusion that *Gordon,* of necessity, stands for the proposition that proponents of a bond issue do not constitute an "identifiable class."

This does not answer the question presented here, for unlike West Virginia's uniform super majority requirement, Arizona, in the words of *Gordon* singles out for special treatment a "discrete and insular

minority"—residents of special road districts. While I might agree that there is no absolute requirement that the state provide for bonding authority to build roads for use of its citizens, once having undertaken to do so the state has, a fortiori, created a class of citizens whose property is subjected to taxation for the creation of those roads. Since I can discern no difference in needs between landowners whose property is taxed for roads under a general improvement district and those whose property is taxed for roads under a special road district, it appears to me that the state must treat all those needs equally, under principles of equal protection. This Arizona has not done. The need for roads of residents of general improvement districts are satisfied by a simple majority affirmative vote. The corresponding needs of residents of special road districts can only be satisfied by a two-thirds affirmative vote. This disparity of treatment in my opinion creates a discernable class for the purposes of applying equal protection principles.

However, simply finding that such a class exists for purposes of equal protection does not also imply a finding that such a class has been unconstitutionally created. This principle is articulated in *Schrey v. Allison Steel Manufacturing Co.,* 75 Ariz. 282, 286, 255 P.2d 604, 606 (1953):

> All discrimination or inequality is not forbidden. Certain privileges may be granted some and denied others under some circumstances, if they be granted or denied upon the same terms and if there exists a reasonable basis therefor. When presented with a law showing partiality, we are always inevitably led into the troublesome problem of classification. The principle involved is not that legislation may not impose special burdens or grant special privileges not imposed on or granted to others; it is that no law may do so without good reason. A principle which none can dispute is that a statute may be allowed to operate unequally between classes if it operates uniformly upon all members of a class, provided the classification is founded upon reason and is not whimsical, capricious or arbitrary. (Cite omitted).

In approaching the issue of classification, the majority correctly finds that the court need only determine whether a reasonable basis exists for the classification, rather than the more stringent test of "strict scrutiny" or "compelling interest." *See State v. Levy's,* 119 Ariz. 191, 580 P.2d 329 (1978). In my opinion a reasonable basis exists for treating special road districts differently than other road improvement districts.

As stated by the majority, the special road districts are rural in nature, with a small number of citizens to carry the financial burden, and the bond issues upon which the citizens vote are not subject to the many requirements of need and cost as are other bond issues before they may be placed on the ballot. The difference in the character of the area and the statutory prerequisites for creation of the district provides a rational basis for different treatment accorded by the legislature for the citizens within special road districts. I find no violation of the United States or Arizona Constitutions' equal protection clauses.

I, therefore, concur with the result reached by the majority.