Alvin C. BRENNER et al., Plaintiffs,

v.

The SCHOOL DISTRICT OF KANSAS
CITY, MISSOURI, et al., Defendants.

John A. MORGAN et al., Plaintiffs,

v.

The SCHOOL DISTRICT OF KANSAS
CITY, MISSOURI, et al., Defendants.

Nos. 17660-1, 17688-1.

United States District Court,
W. D. Missouri, W. D.

Aug. 14, 1970.

Irving Achtenberg, Kansas City, Mo., for plaintiffs Alvin C. Brenner and others.

David R. Hardy, Lane D. Bauer, and Robert E. Northrip, Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, Mo., for plaintiffs John A. Morgan and others.

Edward T. Matheny, Jr., Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for defendants.

John C. Danforth, Atty. Gen. of Missouri, Jefferson City, Mo., intervenor defendant.

MEMORANDUM OPINION
AND ORDER

Before GIBSON, Circuit Judge, and BECKER and OLIVER, District Judges.

JOHN W. OLIVER, District Judge:

I

Plaintiffs, qualified voters in the School District of Kansas City, Missouri, seek a declaratory judgment which would determine that the provisions of the Constitution and statutes of Missouri which require the approval by a two-thirds majority of the votes cast at school bond and school levy elections violate plaintiffs' rights as guaranteed by the Constitution of the United States. The At-

torney General of Missouri has been added as an intervenor-defendant.

Plaintiffs contend that the question presented is "whether a State requirement of an affirmative vote of more than a simple majority, in a popular vote on school tax levies and bond issues violates the Equal Protection Clause of the Fourteenth Amendment."[1] Section 26(b) of Article 6 and Sections 11(b) and 11(c) of Article 10 of the Missouri Constitution of 1945, V.A.M.S., and the implementing Missouri statutes require that the school bonds and the increase of the tax levies here involved to be approved "by vote of two-thirds of the qualified electors voting thereon."

It is undisputed that at a tax levy election held May 20, 1969 more than a simple majority but less than a two-thirds majority of the School District of Kansas City, Missouri electors voted in favor of an increase in the tax levy. The same thing is true in regard to a School District election held July 1, 1969 to authorize the issuance of 12 million dollars of school bonds. Plaintiffs seek to have this Court declare Missouri's constitutional and statutory two thirds majority requirement to be unconstitutional and to declare that the school tax levy and the school bonds here involved, having received a simple majority vote, were duly passed.

All parties concede that the precise question presented has not yet been ruled by the Supreme Court of the United States. Plaintiffs' basic contention is that "the prior rulings of the Court in 'one-man, one-vote' cases establish the doctrines and guidelines which bring the instant case within the ambit of that doctrine." Plaintiffs concede, however, that the validity of their argument rests upon the notion that the "one-man, one-vote" principle enunciated by the Supreme Court in the apportionment cases carries with it an implicit command that all school bond and school tax levy elections conducted in the various States must be decided by a simple majority vote and that all State requirements which require more than a simple majority are constitutionally void.

Plaintiffs agree that "the people have no inherent right to vote on any tax levy or any bond issue proposal." They contend, however, that once "the decision has been placed in the hands of the voters * * * a majority of the people must be allowed to prevail." They argue that "the first corollary of democratic government requires that all persons' votes be counted equally." They then argue that "the second, and necessary, corollary is that when the votes are counted, the majority of voters, on any particular issue, shall determine the result."

Plaintiffs contend that "under any requirement of more than a simple majority, the will of the people is frustrated and a minority of voters determine the result, if they vote for inaction." They argue that "whether one thinks of this as a denial of the equal

---

1. This opinion covers two cases which have been consolidated. Although the complaint in No. 17660–1 states in its body that the Missouri two thirds majority requirement "is contrary to the majoritarian principle of representative government which is basic to a republican form of government," the prayer of that complaint seeks only a declaration that the State requirement is contrary to the Equal Protection of the Fourteenth Amendment. The prayer in No. 17668–3 seeks a similar Fourteenth Amendment declaration but, in addition, seeks a declaration that Missouri's two thirds requirement is violative of Art. IV, § 6 of the Constitution.

It is our view that Luther v. Borden, 7 How. (48 U.S.) 1, 12 L.Ed. 581 (1849) survived what was said about that case in Baker v. Carr, 369 U.S. 186, at 223, 82 S.Ct. 691, 7 L.Ed.2d 663, and Reynolds v. Sims, 377 U.S. 533 at 582, 84 S.Ct. 1362, 12 L.Ed.2d 506, and that any question concerning the Guaranty Clause is not open for judicial determination. See Kohler v. Tugwell, D.C., 292 F.Supp. 978 at 982, aff'd 393 U.S. 531, 89 S.Ct. 879, 21 L.Ed.2d 755 (1969).

It is obvious, however, from what we shall say in regard to the Equal Protection Clause that had we felt free to reach the Guaranty Clause question on the merits, we would have ruled that question in defendant's favor.

protection of the laws, under the Fourteenth Amendment, or a denial of the republican form of government guaranteed under Article IV, Section 4, the constitutional deficiency is the same, a frustration of the will of the people—the supreme law of the land."

In spite of the amount of rhetoric in the briefs devoted to "one-man, one-vote," the questions presented are whether the Constitution or any of its Amendments commands that all issues submitted in a State school election referendum for approval of bonds or levies must be determined only by majority vote of the eligible voters voting at such an election and whether State school election procedures which do not so provide must be held to violate the Constitution. We decide those questions in the negative for the reasons we shall state:

## II

Plaintiffs contend that what Alexander Hamilton said in The Federalist, No. 22, establishes that "it is a fundamental maxim of republican government that the sense of the majority should prevail." Plaintiffs not only quote Hamilton out of context, they ignore a major premise of Hamilton's political philosophy which was in large part shared by Madison and most of the Founders. What Hamilton thought about an absolute rule by the majority is explicitly stated in The Federalist, No. 51, which contains his famous phrase: "If men were angels, no government would be necessary."

Madison, in perhaps the most famous of all The Federalist Papers, The Federalist, No. 10, spoke of the need to provide a system of checks and balances against "the superior force of an interested and overbearing majority." Madison recognized that "the apportionment of taxes on the various descriptions of property is an act in which [no] greater opportunity and temptation are given to a predominant party to trample on the rules of justice."

Madison was as explicit as Hamilton in his statement of the reasons for establishing a system of checks and balances to control what he viewed could be the tyranny of a majority. He recognized that a temporary majority could exercise power "adverse to the rights of other citizens." He said: "To secure the public good and private rights against the danger of such a faction, [i. e., a temporary majority united as a faction] and at the same time to preserve the spirit and the form of popular government, is then the great object to which our inquiries are directed."

It is unnecessary to quote further from the writings of any of the Founders to demonstrate the plaintiffs' reliance upon what Hamilton said in The Federalist No. 22 is misplaced. The whole elaborate scheme of checks and balances in American government, including, but certainly not limited to, the utilization of a two-thirds majority vote on questions considered to be of particular difficulty and importance, establishes that the Founders never for a moment considered, as plaintiffs argue, that "the sense of the majority should prevail" in *all* cases or that they accepted the notion that rule by a simple majority was an inflexible "fundamental maxim of a republican government."

## III

The Constitution says surprisingly little about the fundamental right of suffrage. Art. I, § 2 of the Constitution protects the right to vote in a federal election. The same thing is true of the Fifteenth, Seventeenth, and Nineteenth Amendments. Art. I, § 2 and those Amendments relate to voting but they obviously do not grant any federal right to have a State school election decided by majority vote.

In Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370, decided June 15, 1970, but not yet reported, the Court unanimously stated that "This Court has, of course, recognized that the States 'have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised.' Lassiter v. Northampton County

Board of Elections, 360 U.S. 45, 50, 79 S.Ct. 985, 989, 3 L.Ed.2d 1072 (1959)." Lassiter v. Northampton County Board of Elections, also decided by a unanimous Court, made clear that "while § 2 of the Fourteenth Amendment * * * speaks of the 'right to vote,' the right protected 'refers to the right to vote as established by the laws and constitution of the State.' McPherson v. Blacker, 146 U.S. 1, 39, 13 S.Ct. 3, 36 L.Ed. 869" (360 U.S. at 51, 79 S.Ct. at 989).[2] And in Sailors v. Board of Education, 387 U.S. 105, 109, 87 S.Ct. 1549, 1552, 18 L.Ed.2d 650 (1967), the Court reiterated that "Save and unless the state, county, or municipal government runs afoul of a federally protected right, it has vast leeway in the management of its internal affairs" (387 U.S. at 109, 87 S.Ct. at 1552).

McPherson v. Blacker presented the question of whether Michigan could provide for the election of presidential electors from districts rather than from the State at large. It was obvious that under the political circumstances then existing in that State the districts could be gerrymandered in a manner which could actually give Michigan's electoral college votes to the candidate other than the one who received a majority of Michigan's popular vote, if that vote were counted on a state wide basis. The question was whether Michigan, under the Constitution, had *power* to provide a system of elections by districts which could actually thwart the political principle of majority rule. The Court concluded that there was nothing in the Constitution which prevented Michigan from doing what she wanted to do in regard to the manner in which her electors were elected.[3]

Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965) and Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967) are more recent examples which confirm that there are many facets of State election procedures which are within the exclusive control of the States. *Fortson* involved a reapportionment of the Georgia legislature under which the Georgia Senate was elected by county wide voting in the election of state senators in counties having plural senatorial districts.[4]

Plaintiffs contended that the plan resulted in a "debasement" of their vote. The Court determined that the three judge district court had erroneously found that there was a "dilution or debasement" of the right of voters in the plural senatorial districts to choose their own representative. The fact that the mathematics of counting the votes conceivably could result in the election of someone who received no votes at all in a particular senatorial district was not viewed as a significant factor.

Dusch v. Davis was another multi-district case in which the Court held that the Court of Appeals had erroneously applied the "one-man, one-vote" principle articulated in Reynolds v. Sims. Representation on an eleven member legislative council was involved.

Fortson v. Morris, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966), again

---

2. In his opinion concurring in the result of Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), Mr. Justice Harlan refers to McPherson v. Blacker as "the leading case in this area," stated its holding, and added: "I can perceive no reason to doubt the continued validity of this holding." We agree.

3. In answer to an Equal Protection Clause argument, the Court concluded that "if presidential electors are appointed by the legislatures, no discrimination is made; if they are elected in districts where each citizen has an equal right to vote, the same as any other citizen has, no discrimination is made" (146 U.S. at 40, 13 S.Ct.

at 12). We recognize that Fourteenth Amendment equal protection arguments were not as sophisticated in 1892 as they are today. Nevertheless, the answer given to that argument in 1892 is valid today for the reasons we state.

4. On the basis of mathematics, it was possible under Georgia's election plan for eighteen per cent of the voters in six districts to nullify a unanimous choice of the seventh district with the apparently unconscionable result of having the seventh district represented by someone for whom not a single voter in the district would have cast a vote.

illustrates that the articulation of the "one-man, one-vote" principle in the apportionment cases did not incorporate the political principle of majority rule into the Constitution. An 1824 provision in Georgia's constitution provided that its Governor would be selected (a) by a majority of votes cast at a general popular election; or (b) if no candidate received a majority at the general election, then a majority of the members of Georgia's General Assembly would elect the Governor from the two candidates who received the highest number of votes in the general election. In 1966 no candidate received a simple majority of the popular vote. A three-judge court action was brought to enjoin the Georgia legislature from proceeding with its election of the Governor. The District Court opinion shows that plaintiffs' Equal Protection claim in that case was based on essentially the same rationale as plaintiffs' claim in this case.[5]

The district court found that under the Georgia electoral system "the will of the greater number may be ignored." It erroneously concluded such a result would mean that "this would give greater weight to the votes of those citizens who voted for this candidate and necessarily dilute the votes of those candidates who cast their ballots for the candidate receiving the greater number of votes" (D.C., 262 F.Supp. 93 at 95).[6] Plaintiffs were granted relief.

The Supreme Court reversed. It held that "the District Court erroneously relied on Gray v. Sanders [372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821] * * *." (385 U.S. at 233, 87 S.Ct. at 447). The Court pointed out when Gray v. Sanders was decided it had been considered as "only a voting case" and concluded that there was "not a word in the Court's opinion [in Gray v. Sanders, which] indicated that it was intended to compel a State to elect its governors or any other state officers or agents through elections of the people rather than selections by appointment or elections by the State Assembly." (385 U.S. at 233, 87 S.Ct. at 447). The Court determined that "there is no provision in the United States Constitution or any of its amendments which either expressly or impliedly dictates the method a State must use to select its Governor" (385 U.S. at 234, 87 S.Ct. at 448).

Two separate questions are presented in connection with every election: (1) who are the eligible voters; and (2) what rules are to be applied to determine the result of the elections. This case does not present any question about who is eligible to vote. All persons qualified to vote in any Missouri election are eligible to vote in a school referendum election. The fundamental differences between a candidate election and a referendum election begin to become apparent when precise attention is focused on the question of what decisional rules are available to determine the result of a candidate election and those available in a limited purpose election.

In a candidate election there are a limited number of available rules for determining the winner. In a two man race, the candidate receiving the highest number of votes is obviously the choice of a majority of those voting.

5. That three-judge court opinion stated that "it is claimed that the election system * * * of the Georgia Constitution violates the Equal Protection Clause of the Fourteenth Amendment as interpreted by the Supreme Court in * * * Gray v. Sanders * * * and particularly that portion of the decision which announces the one-person, one-vote principle as being required in state elections" (262 F. Supp. at 94).

6. The three-judge court, in language almost identical to the language used in plaintiffs' briefs in this case, erroneously concluded that "the rationale of Gray v. Sanders * * * makes it plain beyond peradventure that once the class of voters is selected, the vote of each voter must be treated the same" and that because "Georgia has selected the class of voters [and provided for] a popular vote * * * the vote of each of the 900,000 Georgia voters, according to Gray v. Sanders, supra, must be treated equally" (262 F. Supp. at 95).

But in a three man race, a policy choice must be made between (1) declaring the candidate who received the highest number, although not a majority, of votes to be the winner; or (2) by requiring a run-off; or (3) by providing some other method, such as the method selected by Georgia, involved in Fortson v. Morris. Where the applicable State law provides that a candidate receiving a plurality is the winner, it is obvious that the selected decisional rule permits the selection of a winner who has in fact received less than a majority vote.

The same thing is true of the various decisional rules which provide for picking a winner when two candidates receive exactly the same number of votes. The person declared the winner in a tie election, whether selected by lot, by some official body, or otherwise, cannot be said to have been elected by the vote of a majority of the voters. See State ex. inf. Crow v. Kramer, 150 Mo. 89, 51 S.W. 716 (1899), for an example of a tie election case. See 26 Am.Jur.2d Elections § 315 for other examples. No one would seriously argue that the sort of rule established for determining the winner in the candidate elections just discussed violate the Constitution simply because the candidate elected cannot possibly have been elected by a majority of the voters.

The choices of decisional rules available for determining the results of a limited purpose referendum election are much broader than those available in a candidate election. And entirely different and much more complicated policy considerations come into play than those involved in a candidate election. The

available choices in a referendum election frequently involve requirements which result in decisional rules which provide the extraordinary majorities before the proposition submitted to the voters may be considered approved.

Familiar examples are elections to determine whether a county seat should be moved and elections to determine whether a town or city should be incorporated. Some State laws require an absolute majority of all eligible voters, others require a majority of a particular percentage of the votes cast in the same general election, rather than the special election at which the proposition was submitted. Examples of the various and quite varied rules will be found in the cases collected in the annotation "Basis for computing majority essential to the adoption of a constitutional or other special proposition submitted to voters," 131 A.L.R. 1382.

The considerations which justify the selection of a particular ground rule under which extraordinary majorities may be required evolve out of the history of the particular State involved. The experience of a particular State may have established that the stability of the government, or its financial responsibility, may be threatened unless adequate provision is made to obtain a broader consensus than that afforded by a simple majority of those who might vote at a single election.[7]

Much of the discussion of the questions presented in this case overlooks the well known political fact of life that many, many elections are decided in the United States by far less than the majority of the eligible voters. Lord

---

7. See State ex rel. Dobbins v. Sutherfield, (1878) 54 Mo. 391, involving the attempted removal of a county seat; State ex rel. Litson v. McGowan, (1897) 138 Mo. 187, 39 S.W. 771, involving the adoption of a township form of county government; and State v. Winkelmeier, 35 Mo. 103 (1864), involving the sale of beer on Sunday, for examples of extraordinary majority requirements which Missouri selected for the determination of questions which simply would not stay decided un-

less the ground rules provided were calculated to demonstrate that the proposed action had the broad support of a large number of all the citizens in the community. Missouri history teaches, as the cited cases point out, that until such a ground rule was provided, county seat controversies, for example, were not infrequently settled vi et armis. And even Prohibition did not settle the question of beer drinking in St. Louis.

Mansfield's convenient presumption, created in Rex v. Foxcraft, 2 Burr. 1017, that all eligible persons who failed to vote in a particular election are presumed to have acquiesced in the result has long provided a practical political answer to complaints concerning actual minority rule. But one of the recognized phenomena of referendum elections is the fact that voter turnout generally is lower than voter participation in general elections. Experience has established that even if the referendum proposition is submitted at a contemporaneous general election, the number of voters who vote on the submitted proposition is far less than those who vote for candidates. An extraordinary majority requirement is therefore justified as an effective device to protect against an important and frequently highly controversial decision being made by a small minority of all persons eligible to vote.

A two thirds majority requirement, and requirements of a similar nature, reflect a policy determination on the part of a particular State that a greater consensus than a bare majority of the eligible voters who usually vote in school referendum elections must be obtained before recommended governmental action in connection with the school bonds and school levies is approved. That policy decision, and the question of the need for such a policy, is a much more serious matter than making the choice between whether the rules for determining a candidate election will permit a plurality to elect the winner in a three candidate race (and thereby avoid the expense and delay of a run-off election) or whether the State decides that it wants to spend the money for a run-off election and have the two top candidates again take to the hustings.

We know of nothing in the Constitution or in any of its amendments which command a State to have a run-off election simply because the candidate declared to be elected did not receive a majority of the votes cast in the first election. We know of nothing which forbids a State from providing that the elections shall be decided by the flip of a coin or by drawing straws, or any other fair method of lot.

Nor do we know of anything in the Constitution or in any of its amendments which prohibits a State from selecting a particular type of rule which is designed to assure a higher degree of approval of governmental action than that which would be afforded by a bare majority of those eligible voters who might take the time and trouble to vote in a school referendum election. Missouri's two-third majority requirement reflects its choice of decisional rule for a limited purpose election which is calculated to require that a strong consensus of all citizens be demonstrated before school bond and school levies are to receive approval.

■ We know of no provision in the Constitution or in any of its amendments which either expressly or impliedly prohibits Missouri from selecting a decisional rule which provides that its school referendum elections shall be decided by some method other than by a simple majority vote of the voters participating in a particular school election. We so hold.

## IV

The primary difficulty with plaintiffs' "one-man, one-vote" argument is that it fails to take into account the factual situations presented in the apportionment cases in which that principle was articulated and applied. Those cases related to elections in which representatives are chosen to represent the people. The weight of votes cast in one district were in fact diluted or enhanced when compared to the votes cast for the same representative elected from another district. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), was explicitly based on the rationale that where such overweight or underweight results from the accident of particular voters' place of residence, the resultant dilution "impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discrimina-

tions based upon factors such as race, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, or economic status, Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811" (377 U.S. at 566, 84 S.Ct. at 1383).

But the Court explicitly recognized in Reynolds v. Sims that "our constitutional system amply provides for the protection of minorities by means other than giving them majority control of state legislatures." A particular State's determination that no school district shall issue school bonds or increase its tax levy unless two thirds of the voters approve simply does not involve questions which relate to the majority control of any legislative body. The purpose of a school referendum simply is not concerned with the election of any public official.

The type of election involved falls in the general category of elections in which the people are authorized by State law to approve or disapprove the taking of particular governmental action recommended by their elected representatives. Such a referendum election, the theory of which was probably based on town meeting experience, was virtually unknown at state level at the time the Constitution was written.[8]

In his dissent in Kramer v. Union Free School District, 395 U.S. 621, 640, 89 S.Ct. 1886, 1896, 23 L.Ed.2d 583

(1969), Mr. Justice Stewart made the point that "despite the Court's undifferentiated references to what it terms 'the franchise,' " it should be emphasized that "we are dealing here, not with a *general* election, but with a *limited special-purpose election*" [emphasis ours]. The per curiam opinion of the Court in Cipriano v. City of Houma, 395 U.S. 701, 704, 89 S.Ct. 1897, 1899, 23 L.Ed.2d 647 (1969), used the similar "limited purpose election" language. Mr. Justice White, writing for the majority in Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970), No. 1066, October Term 1969, decided June 23, 1970, but not yet reported, 38 L.W. 4511, carefully described a school bond election as "a governmental decision subject to a referendum." In his dissenting opinion in that case, Mr. Justice Stewart raised the question of whether "this case really involved an 'election,' that is, a choice by popular votes of candidates for public office under a system of representative democracy. * * *."

The important consideration which must be kept in focus is that a school bond or levy election is an entirely different sort of political process than that involved in the election of a public official. No actual classification of groups of voters is involved in a school referendum election. No one even knows who is going to vote "yes" or who is going to vote "no." No one knows how the election will be decided until the votes are counted.[9]

---

8. See Pacific States Telephone and Telegraph Co. v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (1912), which involved the constitutionality of Oregon's 1902 initiative and referendum amendment to the Oregon constitution. The Court refused to decide the Guaranty Clause question presented under the rule of Luther v. Borden, *supra.* It is interesting to note, however, that counsel argued that "legislation by the people directly * * * is subversive to the structure of our republic" and called upon the Supreme Court "to maintain and preserve this government against the attack of direct legislation and the absolutism of numbers."

The theory of the Nineteenth Century American political reformers, based on the notion that a cure for what they believed were the evils of democracy was more democracy (in the form of initiative, referndum and recall, direct primaries, and other forms of direct voting by the people) has generally been recognized not to have afforded the hoped for solution to all of our problems. See Walter Lippman, The Unattainable Ideal, in The Phantom Public, MacMillan, (1925).

9. The Comment on Extraodinary Majority Voting Requirements, 59 Georgetown Law Journal, 411, 419 (November 1969) appropriately stated:

"Affirmative voters" do not constitute

We quite agree with the Comment in 58 Georgetown Law Journal, 411, 418 (November, 1969) which concluded that "the reapportionment cases as a class can be distinguished factually on the ground they involved only the right of the electorate to choose representatives." It was, we believe, properly stated that:

The reapportionment cases ultimately speak to the issue of equality of representation, not equality of vote. To insure equal representation, the vote of each person in every constituency must be of equal weight, a result attainable only when the constituencies themselves are equal in terms of population. In such instances, full and effective participation by all citizens in the political process demands application of the one man-one vote rationale. In the case of a bond referendum, however, the principle is inapposite, since the voters are deciding only whether they should tax themselves; full and effective participation already is guaranteed because the voters are exercising the franchise directly, rather than through representatives casting vicarious votes in the legislature. Since the consequences of electing a representative differ significantly from those of a bond referendum, what is necessary to guarantee fairness in one should not be applied automatically to the other.

We conclude that the Supreme Court's articulation of the "one-man, one-vote" apportionment principle does not carry with it, either implicitly or explicitly, a federal Constitutional command that all State school bond and tax levy elections must be decided by a simple majority vote of the voters participating in such an election.

V

The fact that the apportionment cases are not apposite does not mean that the Missouri's two third majority requirement may not be subject to an equal protection analysis. We quite agree with the Comment on Judicial Activism and Municipal Bonds: Killing Two-Thirds with One Stone, in 56 Virginia Law Review 295, 310–312 (March, 1970), which suggested that although the "categories appear novel" and "are entirely artificial," nevertheless "special majority requirements in balloting produce categories which may be subject to an equal protection analysis—those of 'yes' voters and 'no' voters." [10] But to say that it is possible to make an equal protection analysis is not to say that the extrapolation of general language found in various of the Supreme Court cases which dealt with quite different aspects of the right of suffrage is a proper procedure to follow in making such an analysis. Recognition, for example, that the Court

a consistent class of individuals discriminated against because of their status before an election. There is no prospective discriminations; the election must be held before the class of affirmative voters is fixed. In the reapportionment cases, dilution was obvious before any election, and the class subject to discrimination was defined. In extraordinary majority cases, however, an individual's inclusion within the "affirmative voters" classification depends only upon how he decides to vote on the substantive matter in issue.

10. The post-election "classification" of "yes" votes and "no" votes is, of course, in sharp contrast to pre-election discrimination involved in Carrington v. Rash, 380 U.S. 89, 80 S.Ct. 775 (1965) and Davis v. Mann, 377 U.S. 678, 84 S.Ct.

1441, 12 L.Ed.2d 609 (1964), involving military personnel (to which employees of the National Institutes of Health were most recently added in Evans v. Cornman, supra) ; in Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897 (1960) ; and Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886 (1969), involving non-property owners (most recently presented in Phoenix v. Kolodziejski, supra) ; and Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801 (1963), involving the residents of Fulton County, Georgia. The extraordinary two thirds majority requirement obviously involves no possible classification until after all votes are cast and counted because no one can know who may have voted "yes" or "no" until that time. And even then, no one is supposed to know who voted which way.

stated in Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 1080, 16 L.Ed.2d 169 (1966), that "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment," [11] does not throw any real light on the problem. *Harper* treated Virginia's poll tax as a voter's qualification requirement and declared it to be unconstitutional on the explicit rationale that "wealth, like race, creed, or color, is not germane to one's ability *to participate* intelligently in the electoral process" (383 U.S. at 668, 186 S.Ct. at 1082) and that "wealth or fee paying has, in our view, no relation to *voting qualifications*; * * *" (383 U.S. at 670, 86 S.Ct. at 1083) [emphasis ours].

*Harper* was forecast by Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed. 2d 675 (1965). The latter case was based on the rationale that State laws which have the effect of "fencing out" from the franchise a sector of the population "because of the way they vote is constitutionally impermissible" (380 U. S. at 94, 85 S.Ct. at 779). *Harper* and *Carrington* simply are not apposite on their facts.

Both Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886 (1969), and its companion case, Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897 (1969), upon which plaintiffs, so strongly rely, merely reflect the application of principles articulated in *Carrington* and *Harper*. *Kramer*, on its facts, involved a New York statute which impermissibly restricted the franchise in school elections to residents who owned or leased taxable realty. *Cipriano*, on its facts, presented the validity of a Louisiana law which impermissibly provided that only "property taxpayers" could vote in elections called to approve the is-

suance of revenue bonds by a municipal utility system. Phoenix v. Kolodziejski, most recently decided, applied those principles to a slightly different factual situation.

Neither *Kramer, Cipriano* nor *Kolodziejski* presented the question of whether the Equal Protection Clause commands the application of the political principle of majority rule to a state school bond and tax levy election. Each, on their particular facts, dealt with state statutes which, in one way or another, interfered with an otherwise eligible voter's right to exercise his right to vote. No such circumstance is present in the case at bar. Those cases and general language from them are not, in our judgment, apposite and do not aid in an appropriate equal protection analysis of this case.

## VI

There are cases which do provide appropriate guidelines for a possible equal protection analysis. McDonald v. Board of Elections, 394 U.S. 802, 806, 89 S.Ct. 1404, 1407, 22 L.Ed.2d 739 (1969), teaches that, as a point of beginning, "we must determine initially how stringent a standard to use in evaluating the classifications made [by the State law under attack] and whether the distinctions must be justified by a compelling State interest, * * *" In many cases which involved particular facets of the fundamental right of suffrage, the Court has applied a stringent and exacting standard. See, e. g., *Kramer, Cipriano, Kolodziejski.* But the traditional rather than the exacting standard was applied in *McDonald,* a case involving Illinois' absentee ballot procedures. The traditional standard was held to be applicable in *McDonald* because (1) "the distinctions * * * are not drawn on the basis of wealth or race" and (2) because "there is nothing in the record to indicate that

---

11. The same principle was most recently reiterated in Hadley v. Junior College District, 397 U.S. 50, 59, 90 S.Ct. 791, 796, 25 L.Ed.2d 45 (1970), in which the Court stated that "Once a State has decided to use the process of popular election and

'once the class of voters is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded.' Gray v. Sanders, 372 U.S. 368, 381, 83 S.Ct. [801] at 809 (1963)."

the Illinois statutory scheme has an impact on appellant's ability to exercise the fundamental right to vote." The Court stated that "It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots."

The traditional standard applied in McDonald, was based on McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Kotch v. Board of River Port Pilot Commissioners, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947); and Lindsley v. Natural Carbonic Gas, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). Such a standard requires only that the classifications bear some rational relationship to a legitimate state end and will be held to violate the Equal Protection Clause only if the classifications are based on reasons totally unrelated to the pursuit of that goal. Under the traditional standard statutory classifications will be set aside only if no grounds can be conceived to justify them.

*McDonald,* of course, has not been the only case involving some aspect of the right of suffrage which has recognized and applied the traditional standard. See, e. g., Dusch v. Davis, *supra;* Sailors v. Board of Education, *supra;* Fortson v. Morris, *supra;* and Lassiter v. Northampton County Board of Elections, *supra.* Indeed, it has been suggested that "If the political process is to retain the flexibility necessary for compromise and experimentation, all voting restrictions cannot be put to the test of justification by a compelling state interest" (56 Virginia Law Review, at 317).[12]

It is not, however, necessary to choose between a traditional versus an exacting standard because we are convinced that Missouri's two thirds majority require-

ment is valid under a proper application of either standard.

## VII

Missouri's two third majority ground rule evolved out of the same general experience which produced the same and basically similar ground rules adopted by many of the other States in the Union. The success of the Erie Canal in 1825 apparently prompted many States to issue bonds for various internal improvements. Experience established that the various States, for not very appropriate reasons, were unable to control the consequences of their action. Local governmental units were granted power to issue bonds after prohibitions were imposed on the State legislatures. The performance of the local units of government was not much, if any, better. Local debt became uncontrollable; many local units of government faced bankruptcy. The Panic of 1873 forced a rude awakening and the proceedings of the State constitutional conventions reflect the economic and social concerns which produced limitations on debt ceilings, mandatory referendums, extraordinary majority requirements, and other provisions which forced a demonstration of a broad citizen consensus in order to approve any recommended action to incur indebtedness.[13]

The compelling need for requiring an extraordinary majority for approval of bonds has long been recognized by many States in the Union. The author of 56 Virginia Law Review, 295, 296, collected the statutes which relate to the issuance of bonds in the Appendix to that article. That article stated in summary that "Forty seven states have constitutional or statutory provisions requiring local

---

12. It is difficult to believe that the Supreme Court has ever entertained any such idea. Indeed, what the Court has said on that subject would indicate the contrary is true. In Avery v. Midland County, 390 U.S. 474, 485, 88 S.Ct. 1114, 1120, 20 L.Ed.2d 45 (1968), for example, the Court stated that: "The Constitution does not require that a uniform straitjacket bind citizens in devising mechanisms

of local government suitable for local needs and efficient in solving local problems."

13. An excellent history of various ground rules providing for high vote requirements, appropriately supported by a wealth of citation to the authoritative literature, will be found in 56 Virginia Law Review 295, 297.

governments to submit certain proposed issues of general obligation bonds to a referendum. Twenty of those states require referendum approval by special majorities ranging from fifty-five to seventy-five percent of those voting" (Ibid, 296). It was accordingly suggested, we believe properly, that "Two thirds and three-fifths majority requirements could be presumed rational because of their long history and widespread use" (Ibid, 328).

The history of Missouri's two thirds majority requirement is accurately stated by Floyd C. Holmes in his article "Constitutional Limitations Upon Municipal Debt in Missouri," VI Kansas City Law Review 87 (February, 1938). The paragraphs which immediately follow are partially based on his historical research.

Missouri's Constitution of 1820 carried no limitations on the creation of either State or local governmental debt. Missouri's Constitution of 1820 was written during a period of our history when the Legislature enjoyed a high place in public esteem and confidence. The framers of the Constitution of 1820 evidenced their enthusiasm for internal improvements by declaring "internal improvements shall forever be encouraged by the government of this State." In 1837 county governments in Missouri were authorized to subscribe for capital stock and to issue notes in payment. Both the Missouri General Assembly and the county governments immediately thereafter became innoculated with what the first judge of this Court described as the "rising railroad mania in Missouri."[14]

By 1857 the authorized State debt mounted to $24,950,000. A limitation of $30,000,000 was placed on the General Assembly by an 1859 amendment to the 1820 Constitution. It was not, however, until 1860 that a provision was made to prohibit local governments issuing bonds unless approved at a referendum elec-

tion. See Leavenworth & Des Moines RR v. Platte County Court, 42 Mo. 171 (1868). Holmes suggested that if the railroad ventures had measured up to their promise, all would have been well. He added, however, that the State did not end up in an era of boundless prosperity because "many of the undertakings were ill-considered, in the beginning, while others were downright promoters' frauds."

It was in this climate that the Missouri Constitution of 1865 was written. Holmes noted that "the mistakes of the past in dealing with this problem were conceived as having their origin in the Legislatures' practice of authorizing local officials to grant financial aid of one type or another to provide undertakings without first obtaining the sense of the taxpayers." The Missouri Constitution of 1865 therefore included in Section 14 of Article XI a prohibition against any local unit of government from extending aid without first having obtained the assent of two-thirds of the qualified voters.

The Panic of 1873, of course, brought home to the people of Missouri, as it did to the rest of the Nation, the recognition that public debt eventually must be paid by taxes. Holmes correctly noted that "it must not be assumed that all the debt troubles of municipalities grew out of the granting aid to railroads." While there is no question that this was "by far the greatest source of difficulty" it was also true that in the economic boom which followed the Civil War "many communities had lavishly expended borrowed funds to supply themselves with schools, roads, bridges, paved streets, water works, sewers, and other public projects. It was easier to borrow than to wait or pay higher taxes." The Panic of 1873 hit Missouri hard and "the bitterness of the taxpayer was accentuated by the fact that in many instances debt had been incurred without any ref-

---

14. See Judge Krekel's dissenting opinion in Jarrott v. Moberly, Case No. 7,223,

13 Fed.Cas. p. 366 at 370, affirmed 103 U.S. 580, 26 L.Ed. 492.

erence whatever to his wishes and often against his protest  *  *  *." [15]

The members of the Constitutional Convention of 187, in sharp contrast to those of the Convention of 1820, had been "taught by the bitter experience of the past few years" and were writing a constitution during a time in which "the people had to a large degree lost faith in the Legislature and their municipal officials." Holmes suggests that "it almost seems that as if the fears and hardships engendered by the depression, attended by the difficulties in meeting the fixed charges on bonded and floating debt, were seized upon as an excuse, if not to prohibit debt entirely, at least to make it exceedingly hard to incur." The two thirds requirement in Section 12 of Article X of the Missouri Constitution of 1875 included school districts along with every other "political corporation or subdivision of the State." [16]

The portions of the debates at the Constitutional Convention which drafted the 1945 Missouri Constitution quoted by the Attorney General in his brief demonstrate that the question considered by that convention was not whether the two thirds requirement should be relaxed but whether some additional restrictions should be added to the existing requirement. Speakers on both sides of that question obviously assumed that the two thirds vote requirement was acceptable to the people of Missouri and that any proposed constitution which failed to include that provision would likely be defeated at the polls.

15. In Book v. Earl, 87 Mo. 246, 251 (1885), Judge Norton, a member of the Constitutional Convention of 1875, stated: "The restrictions and inhibitions contained in the constitutional provisions were evidently put there in view of a condition of things then existing, and which had existed for years previously, and under which the counties and municipalities of the state were becoming, and had become, ruinously involved in debt, virtually mortgaging the property of the tax-payer for the payment of debts recklessly contracted, in many instances for other than governmental purposes, *not only without the assent of the taxpayers, but against their protests.*"

Whether or not that idea reflected a sound, or even accurate, political judgment and whether or not that judgment reflected a sound policy of government, are questions which are beside any relevant point. That judgment was the judgment of the members of the convention. And that judgment was eventually approved by a majority of those voting in the election to adopt the proposed Constitution. It was under these circumstances that the two thirds majority requirement was continued as part of the basic law of Missouri a relatively short time ago.

## VIII

The history of public education in Missouri is another relevant factor which has played a part in Missouri's continuation of its extraordinary majority requirement in school elections. Missouri history followed the pattern generally established throughout the United States. That pattern, of course, has been most irregular because, as recently pointed out in Epperson v. Arkansas, 393 U.S. 97 at 104, 89 S.Ct. 266, at 270, 21 L.Ed. 2d 228 (1968), "by and large, public education is committed to the control of state and local authorities."

Section 1, Article VI of the Missouri Constitution of 1820 recognized that "schools and the means of education shall forever be encouraged in this state." It provided that the General Assembly enact appropriate measures for the use of the land grant of the United States (Act of March 6, 1820, c. 22, 3 Stat.

See also State ex rel. Hirni v. Missouri Pac. Ry., 123 Mo. 72 at 78 and 82, 27 S.W. 367 at 369 and 370 (1894), for another statement of the climate in which the Constitutional Convention of 1875 conducted its business.

16. The limitations of Section 26(b) of Article VI and of Sections 11(b) and 11(c) of Article X of the Missouri Constitution of 1945, insofar as they required the approval of two thirds of the qualified school electors, had its origin in the Missouri Constitution of 1875. The 1865 Constitution was not broad enough to cover school districts.

545) to the end that "one or more schools be established in each township as soon as practicable and necessary, where the poor shall be taught gratis." The Missouri Constitution of 1865, Section 1, Article IX, advanced the concept that "the poor shall be taught gratis" to a firm declaration that "the general assembly shall establish and maintain free schools for the gratuitous instruction of all persons in this state between the ages of five and twenty-one years." Consistent with the national pattern, the establishment of the free schools was delegated by the state government to the local communities.

The general history of public education demonstrates that some of our most heated political contests have been waged over whether a public school should be established and, if established, how it should be supported. Edwards and Richey state that history in Chapter 9 of The School in the American Social Order; Houghton, Mifflin (1963).

The political battles waged on state and local levels in support of and in opposition to tax supported public education were bitter; mixed, as they were, with all the cross-currents of political upheaval which followed in the wake of Jacksonian Democracy. The forces opposing tax supported free public education were strong and varied. The proponents were zealous. The political conflict most frequently resulted in compromises on the state level in the form of permissive legislation which authorized the citizens of the local community to decide whether they might want a public school.

Missouri's Act of January 17, 1825 (Vol. II of the Laws of Missouri, p. 711) is a very early example of that type of permissive legislation. It is signifi-

cant that a broad citizen consensus was mandated by the requirement that "two thirds of householders, inhabitants of the district" must petition for the establishment of a local school. Experience established that unless at least two thirds of all the citizens in the proposed school district were committed in advance, it would not be likely that the school would be adequately supported by the local community.[17] Missouri, as almost every other State in the Union, refused to vest power in the elected directors of a school district to authorize bonds or fix school levies without the approval of the voters. The fact that various States, including Missouri, consistently required something more than a bare majority to approve the recommended action of the school directors reflects a recognition that the decision to be made was one which necessitated an election ground rule which was reasonably calculated to command the support of all citizens in the school district and one which would also permit other governmental units in the geographical area to have a similar opportunity to obtain sufficient financial support to discharge their duties to the community.

The Missouri Public Expenditure Survey issued a Survey Staff Report in January, 1965, entitled "Changing Requirement For Voting Bonds: A Decision to be Approached with Caution." That Report did not advocate a position on the then current (1965) movement in support of a proposed constitutional amendment which would relax Missouri's two thirds majority referendum requirement.

That Report noted that Missouri's two-thirds majority requirement was applicable to more than 3,200 separate political subdivisions in this State, includ-

---

17. Edwards and Richey directed attention to Missouri's 1825 statute and commented that even such guarded permissive legislation was vigorously opposed, "not only because it opened the way to mandatory taxation, but also on the principle that to permit the idolent, although constituting a majority in many districts, to place their burdens on the thrifty was

wrong." They added: "The more powerful and wealthy the person threatened by the tax, or the more readily he could estimate the immediate and direct effect of the tax upon his own purse, the more likely he was to see the tax as a death-blow to the principles upon which American democracy had been established."

ing 114 counties, 344 townships in 24 of those counties, 811 municipalities, about 1,300 school districts, 107 drainage districts, 59 levee districts, 29 fire protection districts, 5 water supply districts, and 6 sewer districts.

Many of those political subdivisions overlap. It is entirely possible for some property to be taxed for debt service by four or even five overlapping political subdivisions. That circumstance obviously increases the need for ground rules which will tend to require strong citizen consensus in regard to priorities between the various overlapping units of local government.

The Report correctly stated that although "a minority of those voting can prevent the passage of a bond issue," it was also true that "bond issues often are voted upon in elections in which only a small portion of the electorate participates." Data in the office of the State Auditor of Missouri covering 29 elections from January 1, 1963 to June 30, 1964 showed that "although two thirds of those voting is required for approval, many bond issues are approved by a small minority of the electorate." [18] The Report stated that proponents for change frequently contended that "all the electorate has the opportunity to participate in bond elections even if it does not do so." The Report stated opponents of change countered that argument by pointing to the fact that "examination of reports on several hundred

bond elections shows that * * * special elections on bond proposals are often called at times most favorable to those favoring the bond issue * * * [and that] they are frequently called a short time before or after a regularly scheduled election * * * which would have allowed more voters to participate." [19]

The Report commented that "whether or not major depressions can permanently be avoided is a matter of opinion." It added: "There seems to be no doubt, however, localized depressions affecting a local government's ability to retire debt and meet other responsibilities can still occur as a result of such causes as loss of population, or the closing or moving of a large industry or defense installation."

We believe that the circumstances we have stated, some of which are reflected in the Survey Staff Report, clearly establish the compelling nature of the need which Missouri's two thirds majority requirement was designed to meet. Although we entertain some doubt whether a real Equal Protection Clause question is actually presented in this case, we believe that plaintiffs are entitled to have their argument answered in language usually used in cases in which such a question is appropriately presented. The Comment in 59 Georgetown Law Journal 411, 425 (November 1969) stated:

Both the strict and the reasonableness standards of equal protection

---

18. That data established that at least 20 of the 29 issues would have failed if the ground rule for approval required that bonds must be approved by a simple majority of only 50 percent of the number of voters who actually participated in the 1960 gubernatorial election (a figure obviously smaller than 50 percent of persons qualified to vote). The total vote cast in the 29 special bond elections averaged less than a third of those voting for governor.

19. Another portion of the Report directed attention to the problem of political frustration and local conflict created by the built-in political advantage held by proponents of a bond issue. It stated: "Proponents have a number of advantages

over persons who might wish to oppose a bond issue. Resources, facilities, and personnel of local governments are often used in behalf of obtaining a favorable vote. Campaigns for bond issues are often planned and directed by full time officials and employees paid by the local governments. They set the time of the election and use the prestige of the local government to enlist the support of public information media and civic leaders and to raise funds for the campaign. On the other hand, opponents are usually laymen and as such, they often do not have the same public information facilities as those campaigning for the bond issue or are not usually as favorably situated to raise campaign funds."

permit the States to differentiate between electoral issues by employing the extraordinary majority requirement. Under the reasonableness test, such a requirement would be endowed with a presumption of constitutionality, and the burden would be imposed upon the challenger to demonstrate invidious discrimination. If the strict test is utilized, the burden would be upon the State to demonstrate a compelling need for the requirement. The burden that must be overcome by the challenger under the reasonableness test or by the State under the strict test would depend upon a number of factors: (1) The importance of the substantive issue being voted upon; (2) the extraordinary fraction or percentage involved; (3) the need for constitutional stability; (4) the fear of mortgaging the next generation; (5) the population and geographic areas covered; and (6) the number of unsuccessful attempts to secure passage and the closeness of the vote to the extraordinary majority required. By weighing these particular factors, as well as any others deemed relevant in a particular situation, the court could determine under either test whether the burden has been met.

■ We are convinced that under an appropriate application of either equal protection standard to the circumstances of this case, considered in light of the relevant factors stated, plaintiff cannot prevail. We find and conclude that the Missouri ground rule for determining school elections is a reasonable requirement under the traditional standard. If that requirement is subject to a more exacting standard, we find and conclude that it is justified to meet a legitimate and compelling State need.

In short, we find and conclude that there is nothing in the Constitution or any of its Amendments which prohibits

Missouri from establishing and maintaining its two thirds majority requirement for its school referendum elections.

## IX

Missouri's determination to inhibit pure majoritarianism by the establishment of a ground rule calculated to meet a considered need for stability by an objective demonstration of strong citizen consensus in regard to school referendums is not an irrevocable decision on the part of the people of this State. The Missouri Constitution may be, and many times has been, amended by majority vote of the voters participating in the election.

Georgia's 1877 Constitution, Art. VII, § 7(1) not only required a two thirds majority, it further required that the two thirds majority had to constitute a majority of all registered voters. Georgia amended its Constitution in 1945 to provide for simple majority vote. Pennsylvania repealed its former constitutional three fifths majority requirement in 1968. Ohio repealed its former extraordinary majority requirements which varied from 55–65% in 1969.[20]

The nature of the need for maintaining Missouri's long standing policies concerning school elections has been subjected to re-examination by the voters of Missouri since the extraordinary majority requirement was retained when Missouri's 1945 Constitution was adopted. An amendment to Section 11, Article X submitted to the people by the General Assembly was adopted in 1950 (see Laws of Missouri, 1949, p. 642 for text). Section 26(b), Article VI was amended in 1952 (see Laws of Missouri, 1951, p. 889 for text). Section 11(b), Article X was again amended in 1966 upon a submission by the General Assembly (see Laws of Missouri, 1965, p. 934 for text). An amendment proposed by Senate Joint Resolution No. 6, how-

20. Unsuccessful efforts to repeal extraordinary majority requirements in California, Idaho, Missouri, and West Virginia caused the proponents for repeal to turn to a forum other than a vote of the people.

See 56 Virginia Law Review 295, 306, 331–334 for the supporting data stated in this footnote and in the paragraph of the text to which it is appended.

ever, which would have reduced the two thirds majority to sixty per cent was defeated in the November, 1968 election, 609,612 against, 599,434 for (see Laws of Missouri, 1967, p. 678 for text).[21]

Principles articulated in Lucas v. Forty-Fourth General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964), are not applicable because it can simply not be reasonably argued that Missouri's two thirds majority requirement is some sort of pre-election apportionment scheme which deprives the voters of one geographical legislative district a different weighted vote than that granted a voter in some other geographical legislative district.

The fact that Missourians have since 1875 debated and put to the vote of its people the question of how best to maintain the financial stability of its local governmental units, including but not limited to school districts, demonstrates in and of itself that the problem is one of compelling and continuing State interest and that a determination which requires a consensus greater than that which would be afforded by a bare majority is justifiable under any Equal Protection Clause standard.

Short of a doctrinaire assertion that something in the Constitution commands the States to adopt a ground rule which incorporates majoritarianism in all referendum elections, we cannot see how it can reasonably be said any Missouri voter's right to vote somehow runs afoul the Equal Protection Clause.

## X

We believe our determination of this case is consistent with two recent, but generally unnoticed decisions of the Supreme Court. Those cases are Turner v. Clay, 397 U.S. 39, 90 S.Ct. 814, 25 L.Ed. 2d 40 (1970), decided February 24, 1970; and Adams v. City of Colorado Springs, 399 U.S. 901, 90 S.Ct. 2197, 26 L.Ed.2d 555, decided June 22, 1970.

In Turner v. Clay, the Supreme Court granted motions to dismiss the plaintiffs' pending appeal "for want of a substantial federal question." The appeal had been taken from the decision of the Supreme Court of South Carolina in Clay v. Thornton, (Sup.Ct. of So.Car., 1969) 169 S.E. 2d 617.

In Adams v. City of Colorado Springs, the Supreme Court summarily affirmed the three judge court decision of the United States District Court for the District of Colorado which denied plaintiffs relief in Adams v. City of Colorado Springs, (D.Colo., 1970) 308 F. Supp. 1397.

Stern and Grossman point out in their Supreme Court Practice, Sec. 4.28, p. 197, that "The Court is * * * deciding a case on the merits when it dismisses for want of a *substantial* federal question, or affirms summarily" [Emphasis the authors].[22] It is therefore relevant and important to examine the questions presented and decided on the merits in these two recent Supreme Court cases.

The question presented in Clay v. Turner, as stated in the Jurisdictional

21. It is interesting, but not legally significant, to note that Missouri voters cast over 1,800,000 votes for presidential electors in the 1968 general election. Approximately 1,200,000 votes were cast on the proposed constitutional amendment to reduce the extraordinary majority requirement. It was thus possible for a minority of Missourians who exercised their right to vote on November 5, 1968 (some 600,000 out of a total of more than 1,800,000 voters, to be specific) to have at the same time amended the Missouri Constitution.

An argument which would void a State ground rule providing for extraordinary majorities could conceivably be made to void all the elections which have in the past successfully modified the requirements of Missouri's 1945 Constitution relating to school elections.

22. Stern and Grossman in Section 4.28 cite the familiar cases of Equitable Life Assurance Society v. Brown, 187 U.S. 308, 311, 23 S.Ct. 123, 47 L.Ed. 190 (1902); Sugarman v. United States, 249 U.S. 182, 184, 39 S.Ct. 191, 63 L.Ed. 550 (1919); and Zucht v. King, 260 U.S. 174, 176, 43 S.Ct. 24, 67 L.Ed. 194 (1922).

Statement filed in the Supreme Court, was: "Does * * * the South Carolina Constitution of 1895 as interpreted and applied by the South Carolina Supreme Court to require more votes for the incorporation of a city than a majority of those voting in an election for incorporation deprive the majority of those voting, including appellants, of the Equal Protection of the Laws as guaranteed by the Fourteenth Amendment to the United States Constitution?"

An area designated in South Carolina as North Charleston sought incorporation. There were 16,900 electors residing and entitled by law to vote within that area. At the incorporation referendum election only 7,315 voters cast ballots; 4,572 voted "yes," the remainder voted "no." The South Carolina Supreme Court stated that "it is apparent that, while a majority of those voting voted favorably, a majority of 16,900 qualified electors in the area did not cast ballots in favor of incorporation." The Supreme Court of South Carolina explicitly rejected the argument that South Carolina, having determined to ascertain consent to incorporate by way of an election, must also apply Lord Mansfield's presumption that all who absent themselves from an election must be deemed to assent to the expressed will of the majority of those voting. Plaintiffs argued that the trial court's failure to do so violated the Equal Protection Clause of the Fourteenth Amendment. It was argued that the construction given the South Carolina Constitution, which sustained the extraordinary majority ground rule, permitted the State "to add the 'non-votes to the negative votes cast' * * * thereby diluting the votes of those persons voting for incorporation."

The underlying assumption upon which plaintiffs' argument in Clay v. Thornton was based was basically the same as the underlying assumption upon which plaintiffs' argument in this case is based. Both proceed on the notion that if a State utilizes an election for the purpose of obtaining the approval of the qualified voters for a proposed governmental action, as distinguished from the election of a public official, there is something in the Constitution or in the Equal Protection Clause of the Fourteenth Amendment which somehow prohibits such State from requiring any majority other than a simple majority. The South Carolina Supreme Court disposed of plaintiffs' argument that the "yes" votes would be "diluted" by stating that:

The foregoing argument is based upon the principles announced by the United States Supreme Court in the recent reapportionment cases, citing Reynolds v. Sims * * * among others. Their principles have no application here.

The Jurisdictional Statement filed by appellants in the Supreme Court in Turner v. Clay shows that the rationale of the argument there presented was, in essence, the same as the argument plaintiffs present to this Court. Both arguments attempted to use the language of Kramer—"Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment"—as a springboard for their respective "one-man, one-vote" argument.[23] Appellants in Turner v. Clay argued in their Jurisdictional Statement filed in the Supreme Court that "the principle of one-man, one-vote is a fundamental right;" that under the South Carolina law "the right of franchise has been given to the people but has been subjected to limitation by the number of votes required;" that the South Carolina Supreme Court's application of the South Carolina constitutional extraordinary majority requirement "has resulted in the 'debasement or dilution' of the vote of those voting in favor of incorpo-

23. Language from Harper v. Virginia State Bd. of Elections, supra, was also used by plaintiffs' counsel in Turner v. Clay and by plaintiffs' counsel in this case for the same purpose.

ration;" and that "under the actual facts of this case, each negative vote has been given the effect of one and two-thirds affirmative vote."

In the Supreme Court the appellants in the South Carolina case, as do plaintiffs in this case, relied upon Lance v. Board of Education of County of Roane, (Sup.Ct.App., W.Va., 1969) 170 S.E.2d 783, cert. granted sub nom. Gordon v. Lance, 397 U.S. 1020, 90 S.Ct. 1264, 25 L.Ed.2d 530 (April 6, 1970), decided by the West Virginia Supreme Court last year.[24]

Appellees' motions to dismiss in the Supreme Court were based on the express ground that the appeal did not present "a substantial federal question." Appellees contended that South Carolina had not in any manner limited "the right of franchise of any elector" and that the South Carolina constitutional provision related to matters which "rest in the absolute discretion of the State of South Carolina and are matters of State interest only."

It is our view that the Supreme Court's action in granting the motions to dismiss in the South Carolina case for want of a substantial federal question, at least implicitly, rejected the rationale upon which plaintiffs' Equal Protection Clause claim in this case is based. This Court is under duty to give appropriate deference to the Supreme Court's action on the merits in Turner v. Clay.[25]

Adams v. City of Colorado Springs involved a quite different factual situation but the legal principles involved were the same. The Colorado General Assembly passed a statute which permitted some, but not all, Colorado municipalities to annex contiguous territory only when approved by a majority vote of the qualified electors in the territory to be annexed. Judge Doyle, in his opinion for the three-judge court, stated that "plaintiffs concede that the Colorado General Assembly is empowered to create annexation machinery without granting the right to vote, but maintains that when the Assembly extends the franchise to one group it must extend the same right to another group, absent a compelling public reason." Judge Doyle stated:

Plaintiffs seek to equate their position with that of the plaintiffs in the several voting rights cases. Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); Lucas v. Forty-Fourth General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); and Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). [308 F.Supp. at 1402].

24. In the Supreme Court the South Carolina appellants, as do plaintiffs in this case, also directed attention to an Idaho trial court decision (since reversed in Bogert v. Kinzer, (Sup.Ct.Idaho 1970) 465 P.2d 639), and to the litigation then pending in California—Larez et al. v. Shannon et al., in the Superior Court of Sutter County, and to two original proceedings in the Supreme Court of California—Westbrook et al. v. Mihaly, S.F. 22706, and Adams v. Mihaly, S.F. 22707 (since decided in favor of the plaintiffs by the Supreme Court of California on June 30, 1970. See 87 Cal.Rptr. 839, 471 P.2d 487).

25. This Court, consistent with Barton v. Senter, 353 U.S. 963, 77 S.Ct. 1047, 1 L.Ed.2d 901 (Burton, J., and Clark, J., dissenting) in regard to the effect of summary action on the merits, has in the past directed close attention to summary action taken by the Supreme Court in various of the apportionment cases. See Preisler v. Secretary of State of Missouri, D.C., 257 F.Supp. 953, at 971 (aff'd. sub nom. Kirkpatrick v. Preisler, 385 U.S. 450, 87 S.Ct. 613, 17 L.Ed.2d 511 (1967)) and Preisler v. Secretary of State of Missouri, D.C., 279 F.Supp. 952 at 960, fn. 4 (aff'd. sub nom. Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969)).

The three-judge court disposed of that argument by concluding that:

On its face this argument appears to have merit in that the right to vote poses a sensitive constitutional issue demanding scrupulous evaluation. However, on a closer look, it does not appear that the plaintiffs' rights are of the kind that have been upheld by the Supreme Court. * * *

Although we concede that the plaintiffs' case has equitable appeal, they have not demonstrated a violation of the Fourteenth Amendment of the Constitution in terms of either inequality or due process. Hence, their claim must fail.

The argument in the Jurisdictional Statement filed in the Supreme Court by appellant plaintiffs was based on the same cases and the same basic rationale as those relied upon by plaintiffs in this case. The appellants in the Colorado Springs case contended in the Supreme Court that under "the whole line of cases from Baker v. Carr through *Kramer* and *Cipriano* [a] substantial federal question is presented." Appellees, in their Motion to Dismiss or Affirm in the Supreme Court contended that "the cases cited by Appellants in their Jurisdictional Statement alleging invidious discrimination deal with legislative apportionment and voting rights" and are therefore "irrelevant * * * and inapposite."

It is our view that the action of the Supreme Court summarily affirming the three-judge court is consistent with the view we have expressed in regard to this case and that we must give appropriate weight to the Supreme Court's action on the merits in Adams v. City of Colorado Springs.

XI

We have carefully studied the three cases decided by the highest appellate courts of West Virginia, Idaho and California to which earlier reference has been made. We are familiar with Rimarcik v. Johansen, (D.C.Minn., 1970) 310 F.Supp. 61 (appeal pending as No. 147, October Term 1969, 39 L.W. 3023). We have also studied the law review articles which have commented on all of those cases and have considered the far reaching implications and consequences of a decision which would base the invalidation of a State extraordinary majority requirement on federal constitutional grounds. See 70 Columbia Law Review 486 (March 1970); 58 Georgetown Law Review 411 (November 1969); 83 Harvard Law Review 1911 (1970); and 56 Virginia Law Review 295 (March 1970). Cf. Developments in the Law— Equal Protection, 82 Harvard Law Review 1065 (1969).

We note that the California Supreme Court recently stated in footnote 33 on page 850 of 87 Cal.Rptr., 498 of 471 P.2d in Westbrook v. Mihaly that it had read the Supreme Court of West Virginia's opinion in *Lance* and the Supreme Court of Idaho's opinion in *Bogert* but that "neither opinion fully explains its conclusion nor why the United States Supreme Court voting rights and reapportionment cases are or are not apposite. Consequently, neither is of particular assistance to us." We have, of course, concluded that no court can properly declare a particular State's extraordinary majority requirements to be constitutionally void on the theory that the Constitution in general, and the Equal Protection Clause in particular, as construed by the relevant decisions of the Supreme Court of the United States, either commands or supports such a decision.

In light, however, of the grant of certiorari in *Lance,* the pending appeal in Rimarcik v. Johansen, and the not unlikely further appellate proceedings in the California cases and in this case, we do not deem it appropriate to discuss or comment on the rationale of any of the other decided cases.

We have proceeded to decision in this case after certiorari was granted in *Lance* because the view we take of the question presented has not been hereto-

fore stated in any of the decided cases. We proceeded to decision for an additional reason. It is our view that the parties are entitled to the decision of this case in order that they may take any action they may deem appropriate in the public interest. This Court recognizes that there are many who view the sometimes slow working of the political processes of American government with great impatience. At least some have come to look upon the judicial branch of the government as an available means to speed the process of what many may view as reform. But all must recognize that neither the Constitution nor the courts which construe it are a panacea for all the problems which our States and Nation face.

The Constitution of the United States is an enduring instrument of government which permits the States to indulge in the widest area of experiment with ideas of local government. No court can properly apply its personal notion of whether a particular idea is or is not in the public interest. A State may adopt a wide range of constitutionally permissible ideas as a part of its declared public policy. A court may not properly substitute its personal judgment as to whether such an idea is good, bad, or indifferent. It may only determine whether the incorporation of an idea into law is prohibited by the Constitution of the United States or any of its Amendments. And that is all we have done in this case.

### ORDER

Accordingly, and for the reasons stated, it is

Ordered that all relief prayed for in both the above entitled causes should be and the same is hereby denied. It is further

Ordered that the Clerk shall enter judgment for the defendants in each of the above entitled causes.